Opinion
 

 FRIEDMAN, Acting P. J.
 

 Petitioners are a group of liquor distillers and wholesalers. In their petition for mandate they seek alternative kinds of relief, either a writ restraining the Director of Alcoholic Beverage Control from enforcing an amended administrative regulation of his department or a writ directing the superior court to hear and determine a lawsuit directed to the same end. Appearing as amici curiae in petitioners’ support is the
 
 *182
 
 California Grocers Association, which states that it represents 5,800 California retail stores. At the inception of this action we issued a pendente lite order staying enforcement of the regulation.
 

 The regulation in question is rule 100, found in title IV, chapter 1, California Administrative Code, as emended December 10, 1970. For some years the rule had dealt with the^ttiechanics by which distilled spirits producers and wholesalers posted their wholesale price lists with the department. The central aim of the 1970 amendments was to restrict wholesalers in the varieties and rates of discount offered from the basic single-case price.
 
 [1]
 
 Petitioners make a dual attack upon the discount restrictions, charging that amended rule 100 exceeds the department’s statutory power and was adopted through improper procedures. We consider the substantive attack first.
 

 Substantive Validity of Amended Regulation
 

 Substantive review is guided by well-established principles; The regulation comes before the court shielded by a presumption of regularity; focus of judicial inquiry is whether the regulation would alter or amend the statute or enlarge or restrict the agency’s statutory powers.
 
 (Ralphs Grocery Co.
 
 v.
 
 Reimel
 
 (1968) 69 Cal.2d 172, 175 [70 Cal.Rptr. 407, 444 P.2d
 
 79]; Morris v. Williams
 
 (1967) 67 Cal.2d 733, 748-749 [63 Cal. Rptr. 689, 433 P.2d 697].)
 

 Six provisions of the Alcoholic Beverage Control Act (in the Business and Professions Code) form the statutory setting. Four of these provisions are in chapter 10 of the act, entitled “Alcoholic Beverage Fair Trade Contracts and Price Posting.” Section 24749 declares the state’s policy to im
 
 *183
 
 pose restrictions and regulations in order to eliminate price wars which unduly stimulate the sale and consumption of alcoholic beverages and disrupt orderly sale and distribution. Section 24755 requires producers to post with the Department of Alcoholic Beverage Control price lists establishing the minimum retail (i.e., consumer) prices of branded distilled spirits. Section 24756 requires manufacturers and wholesalers to post with the' department and adhere to the (wholesale) prices at which they will sell to retailers. Section 24757 authorizes the department to adopt such rules “as it determines to be necessary” for the administration of certain other sections.
 
 [2]
 
 Not included in chapter 10 is a fifth relevant provision, section 25503, subdivision (e), which prohibits producers and wholesalers from price discrimination among retailers. (See fn. 3,
 
 infra.)
 
 A sixth provision, section 25750, is a general grant of authority to the department to adopt rules to carry out article XX, section 22, of the State Constitution and to enable the department to exercise its statutory powers and duties.
 

 Statutes forcing retailers of branded liquor to adhere to manufacturers’ posted consumer prices are constitutional.
 
 (Samson Market Co.
 
 v.
 
 Alcoholic Bev. etc. Appeals Bd.
 
 (1969) 71 Cal.2d 1215 [81 Cal.Rptr. 251, 459 P.2d 667]; see also
 
 Wilke & Holzheiser, Inc.
 
 v.
 
 Dept. of Alcoholic Bev. Control
 
 (1966) 65 Cal.2d 349 [55 Cal.Rptr. 23, 420 P.2d 735];
 
 Allied Properties
 
 v.
 
 Dept. of Alcoholic Beverage Control
 
 (1959) 53 Cal.2d 141 [346 P.2d 737].) In the present controversy over wholesale pricing,
 
 *184
 
 the parties abstain from constitutional argument. Although somewhat different constitutional and economic arguments are available, the statutory demand for adherence to posted wholesale prices is supported in part by the constitutional and economic considerations which validated the consumer price maintenance law. Thus, for the purpose of this litigation, we- assume the validity of section 24756, the basic command for adherence to posted wholesale prices.
 

 While the parties disagree over the merits of the wholesale price-discount practices pursued by segments of the industry, there is general agreement as to the nature of these practices. In general the market consists of three kinds of retailers: large dealers having multiple stores or outlets; single-outlet or “family” liquor stores; taverns or bars. Over the years wholesalers have established a number of discount practices, some designed to fit retailers’ characteristic needs, others designed primarily as promotional devices. Quantity or “brand” discounts covering a single item appeal to the desires of the multi-outlet retailers who can economically handle large quantities of a single item. Assortment or “line” discounts are designed for small retailers and tavern operators, who wish to stock a relatively heavy inventory of items in high demand but to maintain a rounded inventory of lesser-known items.
 

 Several varieties of these two basic discounts have evolved. There are bottle-size discounts aimed to stimulate sale of quarts and half-gallons; unit discounts offered for designated assortments of brands; multiple brand discounts for a minimum quantity of any two or more brands; the family plan discount, which permits all brands and sizes to assort for quantity; the qualifying discount, described as a “discount on a discount for quantity of any brand or size in the line discount.” The nomenclature and the number of these discounts vary from one distiller’s line to another and from wholesaler to wholesaler.
 

 The disputed amendments are all part of subdivision (f) of rule 100. Subdivision (f)(1) continues a preexisting statement permitting quantity discounts on two or more cases, whether original cases or assorted cases. The amendment added subdivision (f) (3), whose first paragraph prohibits more than one discount for the same quantity of the same item of distilled spirits, but permits quantity discounts upon assortments of different brands (see fn. 1,
 
 ante)-,
 
 subdivision (f)(4), declaring that quantity discounts allowed for assortments may not be conditioned upon inclusion of any specific item or items; and subdivisions (f) (5) through (f) (8), which have the general objective of preventing a wholesaler from informing a retailer of only part of his array of available discounts.
 

 
 *185
 
 Petitioners contend that they are able to provide a higher discount rate on a quantity sale of a single item than on a sale of an equal quantity of assorted brands; that, by prohibiting multiple brand discount rates, subdivision (f)(3) would abolish “traditional” assortment discounts and restrict wholesalers to a straight quantity discount; that (f) (3) thus favors the large retailer who buys heavy quantities of a single brand and disadvantages the small retailer and tavern operator, who are prevented from seeking the deeper discounts otherwise offered for assortment purchases; that, by prohibiting separate discount rates conditional on bottle sizes, subdivision (f) (3) prevents producers from promoting the sales of quarts and half-gallons; that, by preventing assortment of designated brands as a prerequisite for discounts, subdivision (f)(4) prevents producers from promoting their lesser-known brands.
 

 The department contends that its rule is designed to enforce simplification of discount practices. It argues that discount schedules posted by some wholesalers have become voluminous, complex and incomprehensible; that one petitioner’s discount schedules occupy 44 pages; another’s 35 pages and another’s 28 pages; that these schedules are a source of confusion and perplexity to retailers; that a retailer, for example, might buy 25 cases at a $4-per-case discount or 50 cases at a $6-per-case discount without knowing that 27-case or 52-case purchases were available at deeper discounts, for example, $6 or $8 per case, respectively; that to obtain discounts on fast-selling brands retailers are forced to order undesirable brands; that salesmen for wholesalers display different pages of the discount schedules to different retailers, thus allowing greater discounts to favored customers.
 

 In part these arguments deal with the desirability of amended rule 100, rather than its lodgment on a statutory foundation. The latter is the focus of inquiry. At this point it must be observed that the department is not consistent in assessing the effect of its own amendments. Thus an affidavit of the Director of Alcoholic Beverage Control states that it was his objective to promulgate a rule which would simplify discount postings by permitting a single net price after discount on any specified product in a specified order, but permitting assortment of different items offered by the particular producer. In a later brief, the Attorney General claims: “The only discount being eliminated is the tinit (tie in sale) discount. All others are still available.” The court’s reading impels it to agree with petitioners’ interpretation, i.e., that the first paragraph of rule 100(f)(3) would confine the seller to a single discount rate for a given quantity of a particular item of merchandise, regardless of the variety and quantity of other items included .in the order.
 

 Administrative prohibition of multiple discount rates in the sale
 
 *186
 
 of a single brand or item of distilled spirits exceeds the department’s powers. At the heart of the matter is section 24756 (fn. 2,
 
 ante),
 
 which is strictly a price-posting statute. It calls upon the producer to post his wholesale prices, but authorizes no administrative veto of those prices. Section 24756 leaves the choice of prices to the producer, not the department.
 

 While the maxim
 
 inclusio unhts est exclusio alterius
 
 is not the most reliable indicator of statutory purpose,, it is significant that the Legislature has to some extent regulated wholesale discounts for wine and beer but not for distilled spirits. Thus sections 24871 and 24878 limit wholesale wine discounts to 10 percent per case and forbid unauathorized discounts. Section 25006 authorizes departmental rules for “the orderly wholesale marketing and wholesale distribution of beer,” impliedly authorizing a rule prohibiting quantity discounts to beer retailers.
 
 (Ralphs Grocery Co.
 
 v.
 
 Reimel, supra,
 
 69 Cal.2d 172.) Counterpart provisions relative to distilled spirits are found nowhere in the Alcoholic Beverage Control Act.
 

 The department seeks support in section 24749 (fn. 2,
 
 ante),
 
 which expresses a state policy favoring “certain restrictions and regulations” which will eliminate price wars that disrupt orderly marketing. Section 24749 was adopted in 1961 (two years after the Supreme Court’s decision in
 
 Allied Properties
 
 v.
 
 Dept. of Alcoholic Beverage Control, supra)
 
 as part of a series of provisions designed to substitute posted price schedules for fair trade contracts as the principal price maintenance device. (See
 
 Samson Market Co.
 
 v.
 
 Alcoholic Bev. etc. Appeals Bd., supra,
 
 71 Cal.2d at p. 1220.) Section 24749 echoes the justification of constitutionality formulated in
 
 Allied Properties, supra.
 
 It is designed to fortify the statutory system against constitutional attack and to influence the interpretation of its companion provisions. Worthy of note is section 24757 (fn. 2,
 
 ante),
 
 which authorizes rules implementing sections 24754 through 24756 but not the policy statute, section 24749. The latter is not an independent grant of regulatory power to the department.
 

 In
 
 Schenley Industries, Inc.
 
 v.
 
 Munro
 
 (1965) 237 Cal.App.2d 106 [46 Cal.Rptr. 678], the Court of Appeal had before it an earlier version of rule 100, which confined quantity discounts to actual savings in marketing costs. The court invalidated the regulation, declaring: “The Legislature has seen fit to remain silent as.to the subject qf permissible discounts on quantity sales of distilled spirits and it has not delegated the authority to act in this respect to the department.” (237 Cal.App.2d at p. 114.) Our view of the statute parallels that taken by the court in
 
 Schenley.
 
 In attempting to restrict the wholesaler to a single discount rate for a given quantity of a given item, the first paragraph of subdivision (f) (3) would inflate the legislation’s scope beyond that fixed by the Legislature. The provision is thus invalid.
 

 
 *187
 
 The parties debate whether the restriction represents “price-fixing” by administrative fiat. The debate involves nomenclature only and is not pivotal. In invalidating the regulation before it, the
 
 Schenley
 
 court declared: “This is obviously price-fixing by the department, despite the fact that the basic figure upon which the computation is made is supplied by the seller.” (237 Cal.App.2d at p. 110.) In relation to its conclusion that the regulation transcended the statutory scope, the
 
 Schenley
 
 court’s price-fixing appellation was dictum. In
 
 Ralphs Grocery Co.
 
 v.
 
 Reimel, supra,
 
 69 Cal.2d at pages 181-182, the state Supreme Court disapproved the
 
 Schenley
 
 dictum, holding that administrative prohibition of quantity discounts is not price-fixing and does not require the specific support of a price-fixing statute. Elsewhere the court has observed a sharp distinction between price-fixing and regulated posting of the prices which a producer unilaterally fixes for his own product.
 
 (Samson Market Co.
 
 v.
 
 Alcoholic Bev. etc. Appeals Bd., supra,
 
 71 Cal.2d at pp. 1219-1220;
 
 Wilke & Holzheiser, Inc.
 
 v.
 
 Dept. of Alcoholic Bev. Control, supra,
 
 65 Cal.2d at pp. 365-366.)
 

 We perforce agree that the prohibition does not amount to “price-fixing.” That fact provides no guiding star. To set a course by the
 
 ipse dixit
 
 light of price-fixing steers the inquiry far from its statutory anchorage. The question is not whether the first paragraph of subdivision (f) (3) amounts to price-fixing but whether it is reasonably designed to aid a statutory objective. The central factor here is section 24756, a price-posting statute which gives the choice of price to the producer alone, denying price-veto powers to the department.
 

 Administrative restrictions upon producers’ choices of wholesale distilled spirits prices are outside the purview of the welf are-and-morals clause of article XX, section 22, of the state Constitution.
 
 (Schenley Industries, Inc.
 
 v.
 
 Munro, supra,
 
 237 Cal.App.2d at p. 112.) Consequently, the first paragraph of rule 100(f)(3) finds no support in section 25750, which authorizes regulations designed to assist the department in exercising its constitutional control over liquor licenses in the interest of “public welfare or morals.”
 

 The department argues that subdivision (f)(3) leaves each producer free to establish his own basic single-case price, restricting only the number and rate of variations from the basic price. Administrative veto of variations from basic price is no more within the statutory scheme than administrative designation of the basic price itself.
 

 We turn to subdivision (f)(4) of amended rule 100, prohibiting discounts conditioned on purchase of seller-fixed assortments of brands. This phase of the amendment would proscribe the “unit discount” employed
 
 *188
 
 by petitioners. We consider it in the light of section 25503, subdivision (e), which prohibits distillers and wholesalers from indirect or direct price-discrimination among retailers purchasing under like terms and conditions.
 
 [3]
 

 Section 25503, subdivision (e), presents analogies to the federal anti-price discrimination law, the Robinson-Patman Act. (15 U.S.C. § 13.) A review of Robinson-Patman decisions and texts reveals the complexities and subtleties attending adjudications of price discrimination. Some pricing practices easily fall into the illegal category; others call for detailed and complex inquiries of fact and law. We discern a substantial relationship between the prohibition of unit discounts and the anti-discrimination objective of section 25503, subdivision (e). The prohibitory rule comes before us with a strong presumption of regularity.
 
 (Ralphs Grocery Co.
 
 v.
 
 Reimel, supra,
 
 69 Cal.2d at p. 175.) Petitioners have not met the burden of overcoming that presumption. Nowhere in their pleadings or exhibits have they alleged or established the proposition that the unit discount is outside the ambit of section 25503, subdivision (e). They fail, in other words, to establish the department’s lack of power to implement section 25503, subdivision (e), through an administrative rule outlawing the unit discount.
 

 We describe the relationship between the unit discount practice and the anti-discrimination objective of section 25503, subdivision (e):
 

 In the parlance of marketing regulation, a sale or price offered on condition that the buyer order additional products or services receives the appellation “tie-in sale.”
 
 (Times-Picayune Pub. Co.
 
 v.
 
 United States
 
 (1953) 345 U.S. 594, 605-606 [97 L.Ed. 1277, 1288-1289, 73 S.Ct. 872];
 
 American Mfrs. M. 1. Co.
 
 v.
 
 American Broadcasting-Para. Th.
 
 (2d Cir. 1967) 388 F.2d 272, 280-283.) Generally, seller-imposed tie-ins which condition the purchaser’s eligibility to buy one product upon his ordering a separate product are coercive and monopolistic.
 
 (Northern P. R. Co.
 
 v.
 
 United States
 
 (1958) 356 U.S. 1, 5-6 [2 L.Ed.2d 545, 549550, 78 S.Ct. 514];
 
 Times-Picayune Pub. Co.
 
 v.
 
 United States, supra;
 
 see generally, Pearson,
 
 Tying Arrangements and Antitrust Policy
 
 (1965) 60 N.W. Univ.L.R. 626.) Viewed as a tie-in, petitioners’ unit discount is only one of a series of available discount options. It does not compel any retailer to buy one product in order to get another. It offers all retailers the
 
 *189
 
 economic inducement of a deeper discount on one named brand by buying specified quantities of other named brands. It is theoretically optional, theoretically noncoercive.
 

 Certain pricing devices, theoretically available to all buyers, may give powerful buyers competitive advantages over less powerful ones.
 
 (Federal Trade Com.
 
 v.
 
 Morton Salt Co.
 
 (1948) 334 U.S. 37, 42-43 [92 L.Ed. 1196,1202-1203, 68 S.Ct. 822, 1 A.L.R.2d 269].) Whatever the injuries inflicted horizontally (i.e., upon the seller’s competitors), an injury is inflicted when a less powerful buyer is denied an economic advantage available to his more powerful competitor. In Robinson-Patman parlance, harm to competing buyers is termed “secondary-line” injury.
 
 (Federal Trade Com.
 
 v.
 
 Anheuser-Busch
 
 (1960) 363 U.S. 536, 544-545 [4 L.Ed.2d 1385, 1390-1391, 80 S.Ct. 1267]; Baum, The Robinson Patman Act (1964) p. 8; Rowe, Price Discrimination Under the Robinson-Patman Act, p. 180 et. seq.; Sawyer, Business Aspects of Pricing Under the Robinson-Patman Act (1963) p. 43 et seq.; see also Rowe,
 
 Price Differentials and Product Differentiation: The Issues Under the Robinson-Patman Act,
 
 66 Yale L.J. 1 (1956).) Petitioners assert (and we know judicially) that some liquor distillers have succeeded in establishing a heavy consumer demand for particular brands of whiskey. The heavy demand endows these brands with a unique market position which enables them to overcome the competition of lower-priced, lesser-known brands. Heavy consumer demand for one of his brands endows the distiller with leverage in the sale of his other brands. Petitioners say that the unit discount “encourages” retailers to stock and promote lesser-known brands, thus protecting the latters’ market opportunities. The argument is no more than an euphemistic claim of good faith competition at the production and wholesaling levels. It ignores the unit discount’s discriminatory impact upon retailers.
 

 When fast-selling Brand A is offered at a deeper discount if ordered with slow-selling Brands B and C, Retailer #1, who can economically handle Brands B and C, realizes a higher mark-up on Brand A than Retailer #2, who cannot economically absorb Brands B and C into his inventory. The relative inability of Retailer #2 may stem from lack of operating capital, from a lesser number of outlets or from variations in consumer demand within a single competitive marketing area. The heavy consumer demand for Brand A puts Retailer #2 under economic pressure to buy it at the lowest available per-unit price, even at the cost of tying up capital in relatively slow-moving items. When, as permitted by California law, the distiller establishes both the wholesale and retail prices of branded merchandise, he effectually controls the per-item gross markup. When virtually all retailers are under customer pressure to stock Brand A, the unit discount enables the
 
 *190
 
 distiller to confer higher-markups upon retailers who can economically handle the tie-in purchase, lower markups upon those who cannot.
 

 Section 25503, subdivision (e), prohibits indirect as well as direct price discriminations. It restricts itself to retailers purchasing “under like terms and conditions.” The availability of a producer’s unit discount to all retailers provides only theoretical equality. Section 25503, subdivision (e), seeks an objective similar to that discerned for the resale price maintenance provisions of the Alcoholic Beverage Control Act—reasonable equality of competitive opportunity among retailers of various capabilities. (See
 
 Wilke & Holzheiser, Inc.
 
 v.
 
 Dept. of Alcoholic Bev. Control, supra,
 
 65 Cal.2d at p. 362.) The “like terms and conditions” clause may reasonably be interpreted to embrace not only variations in the wholesaler’s offer but also variations in the offer’s impact upon retailers of different economic capabilities. In the review of administrative rules, a reasonable interpretation of the underlying statute is judicially acceptable as statutory foundation for the rule.
 
 (Ralphs Grocery Co.
 
 v.
 
 Reimel, supra,
 
 69 Cal.2d at p. 176.) The department could reasonably view rule 100(f)(4) as a means of prohibiting an indirect discrimination among retailers who- differ in their economic ability to absorb tie-in items into their inventories. Since petitioners have not met the burden of overcoming the presumptive validity of subdivision (f) (4), we hold it a proper implementation of the department’s statutory authority.
 

 Petitioners have withdrawn their substantive attack on subdivisions (f) (5) through (f)(8) of rule 100. These provisions have the objective of preventing a wholesaler from informing his customer of less than his entire range of discounts. They form a reasonable implementation of section 24756, which requires producers to adhere to their posted wholesale prices, and of section 25503, subdivision (e), the anti-discrimination statute.
 

 Validity of Amendment Procedure
 

 Petitioners make a two-pronged attack upon the adoption procedures pursued by the Department of Alcoholic Beverage Control. First, they argue that the statutory notice of hearing was misleading and violative of the requirements of the Administrative Procedure Act. (Gov. Code, § 11370 et seq.) That act requires public notice and hearing preceding the adoption or amendment of administrative regulations of state agencies. At least 30 days preceding a change in the regulations the agency must publish and mail notices designating the time and place of a public hearing; the notices must include the text or an informative summary of the proposed action. (Gov. Code, §§ 11423, 11424.)
 
 [4]
 
 At the hearing the agency must
 
 *191
 
 afford interested persons the opportunity to present “statements, arguments, or contentions” and shall consider “all relevant matter presented to it” before enacting the change. (Gov. Code, § 11425.)
 

 Petitioners contend that the department’s notice of hearing was inadequate and misleading; that the regulation ultimately adopted differed widely from that described in the notice.
 

 The department issued its notice of hearing on September 18, 1969. It listed a number of proposed changes in departmental rules, including: “8. Amend Rule 100 (a), (f) and (j) relative to the posting of quantity discounts on original and assorted cases, to define an assorted case, to specify the only types and classifications of discounts which may be filed, to designate the proper mailing address of the department for the purpose of filing price schedules, and to- reletter remaining subdivisions.”
 

 Accompanying the notice was a draft of amendments to rule 100. It is not clear whether the draft was included with the published notice or simply mailed to members of the industry. The proposed draft, in any event, listed those kinds of discounts which would be acceptable for filing with the department. It named seven permissible kinds of discounts, including the line (assortment), brand (quantity) and unit discounts. The draft declared that these “and no others” would be acceptable for filing. Petitioners’ thesis is that the draft rule proposed by the department gave no hint of its ultimate action, which restricted each producer to a single discount rate for a given quantity of a particular item of merchandise. As we have held
 
 ante,
 
 rule 100 effectively abolished only the unit discount. Thus petitioners’ procedural target is much narrower than appeared at the outset of the litigation.
 

 The Attorney General charges that petitioners’ participation in the administrative hearing constituted a waiver of any deficiencies in the notice, citing
 
 Stoumen
 
 v.
 
 Munra
 
 (1963) 219 Cal.App.2d 302, 307 [33 Cal.Rptr. 305]. In response to our inquiry at oral argument, the Attorney General conceded that the Department of Alcoholic Beverage Control had failed to record the oral testimony and arguments at the administrative hearing and had established no group of documentary exhibits. In the absence of an administrative record, a reviewing court is unable to form an image of the hearing and unable to envision the hearing’s focus. In the absence of an
 
 *192
 
 administrative record, the Attorney General’s claim of waiver will not be entertained.
 

 Government Code section 11424, subdivision (c), calling for publication of “the express terms or an informative summary” of the proposed rule, has' a counterpart in the federal Administrative Procedure Act. The latter is somewhat broader, calling for a notice which includes “either the terms or substance of the proposed rule or a description of the subjects and issues involved.” (5 U.S.C. § 553(b) (3).) The federal statute has not been construed as a restriction to the precise proposal described in the notice.
 
 (California Citizens Band Association
 
 v.
 
 United States
 
 (9th Cir. 1967) 375 F.2d 43, 48;
 
 Logansport Broadcasting Corp.
 
 v.
 
 United States
 
 (1954) 210 F.2d 24, 28 [93 App.D.C. 342];
 
 Willapoint Oysters
 
 v.
 
 Ewing
 
 (9th Cir. 1949) 174 F.2d 676, 684-685.)
 

 The interpretive problem is whether Government Code section 11424, subdivision (c), confines the agency substantially to the proposal described in the published notice; or, on the contrary, permits a regulation dealing with the subject or issue evoked by the published notice but differing in substance. We approach the interpretive problem with the view of promoting the general objective of the legislation.
 
 (Redevelopment Agency
 
 v.
 
 Malaki,
 
 216 Cal.App.2d 480, 487 [31 Cal.Rptr. 92].)
 

 An examination of extrinsic publications contemporaneous with the 1947 enactment of these administrative procedure statutes supplies no interpretive clues and reveals no express design underlying the verbal difference between the notice provisions of the federal and state laws. (See 21 State Bar J. 161,164 (1946); 22 State Bar J. 391, 393-394 (1947); 22 Los Angeles Bar Bull. 201, 211-214 (1947); 21 So.Cal. L.Rev. 21, 25 (1947).) They do evince reliance upon the general pattern supplied by the federal Administrative Procedure Act. (21 State Bar J. at p. 164; 22 State Bar J. at p. 394.)
 

 Section 11424 is part of a statutory system designed to provide “a method for the adoption of administrative regulations which [will] afford a reasonable opportunity for those subject to such rules to present views and' argument in advance of their promulgation . . . .” (Kleps,
 
 The California Administrative Procedure Act (1947) 22
 
 State Bar J. 391, 393.) The participatory process is initiated by a notice arousing advance awareness of the subject or issue involved in the proposed action. The draft of summary of the proposed action required by section 11424, subdivision (c), serves that function. Awareness of the subject or issue supplies affected interests an opportunity to make advance preparations for the forthcoming hearing.
 

 
 *193
 
 The hearing is designed to measure the draft proposal’s advantages and disadvantages; to supply a forum for objections and expressions of full or partial agreement; to permit counterproposals. Regulatory agencies frequently find difficulty in predicting the practical impact of regulatory proposals. The hearing not only assures public participation; it also provides the agency with an improved set of predictions. A prime objective is to persuade the agency into action differing from its pre-hearing proposal. If the persuasion is successful, the adopted regulation will necessarily diverge from that described in the pre-hearing notice.
 

 Thus, eventual adoption of a regulation differing from that described in the pre-hearing notice is one objective of the hearing process. Fairness too is a statutory desideratum. After an opportunity for participation in a hearing considering the subject or issue evoked by the pre-hearing draft or summary, affected interests cannot claim unfairness when the agency’s consideration of new information and views persuades it into a different enactment dealing with the identical subject or issue. To confine the agency to the terms of its pre-hearing proposal would negate a basic purpose of the hearing. To require a new notice and hearing would tie the agency into time-consuming, circular proceedings transcending the statutory objective.
 

 Although section 11424, subdivision (c), requires a pre-hearing notice of the text or summary of the proposed action; although it does not echo the federal statute’s alternative permission for a notice describing the subject or issue, nevertheless, it is not offended if the adoption procedure culminates in a regulation differing substantially from that described in the published notice but devoted to the same subject or issue.
 

 In this case the Départment of Alcoholic Beverage Control gave public notice of a proposed amendment to rule 100 which would “specify the only types and classifications of discounts which may be filed, . . The notice sufficiently communicated awareness of proposed restrictions upon the number and kinds of discounts to be filed and to be available to retailers. The amendment, as adopted, dealt with the very subject or issue evoked by the notice of hearing. Thus the agency sufficiently complied with section 11424, subdivision (c).
 

 The second prong of the procedural attack is a claim of improper use of the emergency adoption procedure authorized by the Administrative Procedure Act. The department’s notice of hearing issued on September 18, 1969, designated a hearing date of October 22, 1969. Somewhat more than a year after the hearing, on November 12, 1970, the department filed with the Secretary of State an amended version of rule 100. According to statute (Gov. Code, § 11422), the amendment would become effective on the thirtieth day after filing. The affidavit of the Director of Alcoholic Bev
 
 *194
 
 erage Control declares that three licensees
 
 [5]
 
 out of more than 200 who post wholesale prices complained of ambiguities in the amendment; that, after meeting with these licensees the department redrafted the proposed rule and filed it with the Secretary of State on December 10, 1970, as an emergency enactment. It is the December 10 version of rule 100 whose substantive validity we have considered here.
 

 Government Code sections 11421, subdivision (b), and 11422, subdivision (c), permit a state agency to adopt emergency regulations with or without prior notice and hearing; require a finding describing the emergency and declaring its necessity for the immediate preservation of public peace, health and safety or general welfare. If the emergency enactment has not been preceded by a noticed hearing, section 11422.1 limits its effective period to 120 days unless the agency follows it with post-adoptive notice and opportunity for hearing and files a certificate of compliance.
 

 In this case the department’s December 10, 1970, filing was accompanied by a finding of emergency which we append in a footnote.
 
 [6]
 
 Because notice of hearing had been published and a hearing held prior to the November 12, 1970, filing, the department accompanied the new version with a certificate showing pre-adoption compliance with the notice and hearing requirements of the Administrative Procedure Act.
 

 Petitioners assert that the department’s emergency action was inconsistent with the Administrative Procedure Act as construed by this court in
 
 California Assn. of Nursing Homes etc., Inc.
 
 v.
 
 Williams
 
 (1970) 4 Cal.App.3d 800 [84 Cal.Rptr. 590, 85 Cal.Rptr. 735]. The assertion has no merit. In the
 
 Nursing Homes
 
 case we noted a possible abuse of the emergency power when the enacting agency repeatedly and habitually resorted to it without a credible statement of genuine emergency. (4 Cal.App.3d at p. 812.) What constitutes an emergency is primarily a matter for the
 
 *195
 
 agency’s discretion. (Cf.
 
 Davis
 
 v.
 
 County áf Los Angeles
 
 (1938) 12 Cal.2d 412, 422 [84 P.2d 1034].) Here a group of licensees convinced the agency that its draftsmanship was ambiguous and troublesome. The regulation would become effective by operation of law 30 days from filing, that is, on December 12, 1971. Accordingly, the agency filed a substitute and hopefully improved text on December 10. In deciding that the incipience of a confusing regulation represented an emergency, the agency did not abuse its discretion.
 

 Validity of Statutory Restriction Upon Judicial Review
 

 Petitioners originally filed a superior court action seeking to enjoin the Department of Alcoholic Beverage Control from enforcing rule 100. The superior court refused to intervene, believing that Business and Professions Code section 23090.5 deprived it of jurisdiction. That statute channels judicial review of decisions and rules of the Department of Alcoholic Beverage Control into the appellate courts and precludes judicial attack through the medium of superior court actions.
 
 [7]
 
 Petitioners then instituted the present mandate proceeding. As we stated at the outset, petitioners seek an alternative remedy—a writ directing the superior court to assume jurisdiction.
 

 Petitioners contend that section 23090.5 should be construed to apply only to the review of adversary, i.e., quasi-judicial, proceedings before the liquor control agency in which a transcript of an administrative hearing is compiled as a basis for judicial review. The present proceeding involves a rule-making, i.e., quasi-legislative action. No record of the administrative hearing exists as a basis for judicial review. Petitioners contend that only in the superior court may it freely adduce proof to demonstrate the adverse effect of the regulation; that, if section 23090.5 is construed to apply to lawsuits seeking review of departmental regulations, it trenches upon the original jurisdiction conferred upon the superior courts by article VI, section 10, of the California Constitution.
 
 [8]
 

 
 *196
 
 In
 
 Samson Market Co.
 
 v.
 
 Kirby
 
 (1968) 261 Cal.App.2d 577, 581 [68 Cal.Rptr. 130], the court construed section 23090.5 to deprive the superior court of jurisdiction where the department was acting in its “administrative” capacity. In
 
 Dept. of Alcoholic Bev. Control
 
 v.
 
 Superior Court
 
 (1968) 268 Cal.App.2d 67 [73 Cal.Rptr. 780], the court sustained the statute’s constitutionality in a case involving a license suspension, i.e., a quasi-judicial action. (See also,
 
 Kirby
 
 v.
 
 Superior Court
 
 (1969) 275 Cal.App.2d 975 [80 Cal.Rptr. 381].) The court viewed the legislative restriction upon superior court jurisdiction as a reasonable implementation of the alcoholic beverage provision of the state Constitution. (Art. XX, § 22.)
 

 Contrary to petitioners’ contention, section 23090.5 cannot be construed to affect only quasi-judicial acts of the department. By its very terms it excludes superior court jurisdiction to review rules as well as orders and decisions of the department. The department’s quasi-judicial actions are reviewable by the Alcoholic Beverage Control Appeals Board. (Cal. Const., art. XX, § 22.) Quasi-judicial actions are governed by Business and Professions Code section 23090 rather than 23090.5. (See fn. 7,
 
 ante.)
 
 The latter section is distinctly designed to channel into the appellate courts proceedings challenging rules and regulations of the liquor control agency. Although Government Code section 11440 permits superior court declaratory relief actions to review regulations adopted under the Administrative Procedure Act, that provision is partially limited and superseded by section 23090.5.
 

 Petitioners’ claim of unconstitutional interference with their access to the courts requires two assumptions: first, that a party with standing to seek judicial review of an administrative regulation is entitled to a de novo hearing, including the right to adduce fresh evidence; second, that this right is strangulated when the party is deprived of superior court review and confined to review by means of an original writ action in the appellate court. The first assumption is unfounded; hence exploration of the second assumption is needless.
 

 We turn to the first assumption. A general principle limits judicial review of administrative rule-making to an examination of proceedings before the agency to determine whether its action is arbitrary, capricious or entirely lacking in evidentiary support or whether it has failed to follow procedures established by law.
 
 (Pitts
 
 v.
 
 Perluss
 
 (1962) 58 Cal.2d 824, 833 [27 Cal.Rptr. 19, 377 P.2d 83];
 
 California Assn. of Nursing
 
 
 *197
 

 Homes etc., Inc.
 
 v.
 
 Williams, supra, 4
 
 Cal.App.3d at p. 815.) In obverse, the principle views the taking of evidence as the exclusive function of the administrative agency, rejecting fresh evidentiary inquiry in the courts.
 
 [9]
 
 Thus, as a matter of general principle, a party cannot complain if review is confined to a writ proceeding in an appellate court. He is not deprived of the right to produce evidence in a court of general trial jurisdiction, because all the courts are precluded from fresh evidentiary inquiry.
 

 This case doesn’t quite fit the general principle. Here for unknown reasons the administrative agency did not record its hearing; it supplies the reviewing court with no transcript. If the validity of its action turned on a question of evidentiary support, judicial review would be impossible The presumption of regularity attending administrative rule-making cannot supply the lack of a hearing.
 
 (Interstate Commerce Com.
 
 v.
 
 Louisville & N. R. Co.
 
 (1913) 227 U.S. 88, 93-94 [57 L.Ed. 431, 434, 33 S.Ct. 185].) No more can the presumption of regularity compensate for an absent administrative record when the case turns on a question of evidentiary support.
 

 Certain kinds of quasi-legislative action depend upon factual evidence; others do not. In
 
 Rivera
 
 v.
 
 Division of Industrial Welfare
 
 (1968) 265 Cal.App.2d 576 [71 Cal.Rptr. 739], and again in the
 
 California Nursing Homes
 
 case, this court was faced with the review of price or rate establishment actions of administrative agencies. In
 
 Rivera
 
 we decried “off record” investigations which paralleled the recorded hearings (265 Cal.App.2d at p. 588.) In the
 
 California Nursing Homes
 
 case we stated; “Without identification of the evidence forming the basis of the agency’s action, a reviewing court can neither affirm nor deny the existence of evidentiary support. The court cannot invalidate the action by measuring evidence produced by its assailant, for it may differ from the evidence considered by the administrator. Without a record identifying the latter, the deficiency centers on the promulgation process, never reaching the alleged substantive violation.” (4 Cal.App.3d at pp. 815-816.)
 

 Other kinds of quasi-legislative activity are less dependent upon the assemblage of specific facts. An authoritative commentator draws a distinction between trial-type hearings which call for adjudicative facts (“roughly the kind of facts that go to a jury”) and argument-type hearings for the reception of legislative facts which “do not usually concern the immediate parties but are general facts which help the tribunal decide
 
 *198
 
 questions of law and policy and discretion.” (1 Davis, Administrative Law Treatise (1958) p. 413.) This court has drawn a parallel distinction between evidence of “private facts” whose incorporation in a hearing record is an indispensable condition of fairness and “public conditions” available to anyone who cares to investigate; between factual evidence and judgmental or argumentative evidence.
 
 (Rivera
 
 v.
 
 Division of Industrial Welfare, supra,
 
 265 Cal.App.2d at pp. 589-590.)
 

 No hard-and-fast rule determines whether a regulation is of the sort reviewable only through a formal evidentiary record. An agency which chooses to dispense with a record runs the risk of drifting into unreviewable action, in which case the courts tell it to start over again (e.g.,
 
 California Assn. of Nursing Homes etc., Inc.
 
 v.
 
 Williams, supra).
 
 Failure to establish an evidentiary record is particularly inappropriate when, as here, a statute divests of jurisdiction the only kind of court truly adapted to independent factual inquiries. If the Department of Alcoholic Beverage Control dispenses with an administrative record in the face of established principles pinning judicial review to that record, it exposes its action to the risk of procedural demolition before questions of substantive validity ever arise.
 

 In this case our substantive inquiries convince us that validity of rule 100 does not entail inquiry into'specific evidentiary facts; rather, it stands or falls by matching its provisions against the statutes in the light of undisputed or judicially known facts. Judicial review turns on questions of law rather than fact and is not frustrated by absence of an administrative record. Thus the general principle excluding de novo evidentiary inquiry in the reviewing court may be invoked fairly and confidently.
 

 As a judicial restriction upon the review of quasi-judicial actions of the liquor control agency, section 23090.5 was upheld because the Legislature had not placed an unreasonable burden on citizens’ access to the courts of general trial jurisdiction.
 
 (Dept. of Alcoholic Bev. Control
 
 v.
 
 Superior Court, supra,
 
 268 Cal.App.2d at p. 74.) The burden is no more unreasonable when applied to review of the rule-making power. De novo evidentiary inquiry would be no more available in the superior court than in the appellate courts. Petitioners’ constitutional claim falls.
 

 The Question of Severability
 

 The parties have not discussed the possibility of rule 100’s partial invalidity nor debated the issue of severability. At the end of rule 100 is subdivision (m), a statement of severability which declares that invalidity of any portion of the rule shall not affect the remainder.
 

 The general rules established for partially invalid statutes provide ready
 
 *199
 
 guidance when part of an administrative regulation falls. (See
 
 Hynes
 
 v.
 
 Grimes Packing Co.
 
 (1949) 337 U.S. 86, 118 [93 L.Ed. 1231, 1254, 69 S.Ct. 968];
 
 Addison
 
 v.
 
 Holly Hill Fruit Products
 
 (1944) 322 U.S. 607, 618-619 [88 L.Ed. 1488, 1496-1497, 64 S.Ct. 1215]; 2 Am.Jur.2d, Administrative Law, § 298.) Partial invalidity will not cause nullification of the entire enactment if the enacting body intended it to be sever-able; when preservation of the valid portion will cause a result not intended by the enacting body, the whole will be invalid; a declaration of sever-ability, although not conclusive, is persuasive evidence of the enacting body’s intent; a severability clause gains increased strength when the invalid portion can be mechanically severed from the remainder.
 
 (In re Blaney
 
 (1947) 30 Cal.2d 643, 653-655 [184 P.2d 892]; 3 Witkin, Summary of Cal. Law (1960) Constitutional Law, §§ 33-34.)
 

 We have found invalid the first paragraph of subdivision (f) (3), which prohibits multiple discount rates. That prohibition can be mechanically severed from the remainder of subdivision (f)(3) and from the remainder of the rule. (See fn. 1,
 
 ante.)
 
 Mechanically, the prohibition of the unit discount in subdivision (f) (4) is entirely severable from the invalid part of subdivision (f) (3). Nevertheless, the basic question remains—would the liquor control agency have singled out the unit discount for selective prohibition while permitting all other discount practices to stand?
 

 The severability clause supplies a stereotyped affirmation, routinely attached prior to the actual contingency, abstracted from it and without foreknowledge of its real character. There are two reasons why the sever-ability clause is not persuasive as an expression of intent: First, the present draft of subdivision (f) (4) expressly ties it to assortment discounts, as “authorized and limited” by subdivision (f)(3). (See fn. 1,
 
 ante.)
 
 Thus subdivision (f) (4) expresses an underlying unity of purpose which contradicts the perfunctory declaration of severability.
 

 Second: Liquor marketing in California involves a complex and delicately articulated array of economic and regulatory arrangements and practices. A prohibition or restriction of one isolated activity may have unforeseen repercussions upon other activities. Experience, evidence and debate should precede the selection of regulatory topics. Neither the agency nor a reviewing court should deal in abstractions. This court has no ready-made expertise by which to measure the desirability and workability of a selective prohibition of the unit discount. Despite the prohibition’s abstract validity, nullification is the practical judicial expedient because the agency may re-enact the prohibition in short order if it sees fit. We heed Justice Frankfurter’s admonition: “It would be the sheerest guesswork to believe that elimination of an important factor in the Admin
 
 *200
 
 istrator’s equation would have left his equation unaffected even if he did not here insist upon its importance.”
 
 (Addison
 
 v.
 
 Holly Hill Fruit Products, supra,
 
 322 U.S. at p. 619 [88 L.Ed. at p. 1497].)
 

 In contrast, subdivisions (f) (5) through (f) (8) simply call for widespread dissemination of all the currently effective discounts offered by any wholesaler. The latter portions of rule 100 are readily workable, independently of those whose operation we here restrain.
 

 Let a peremptory writ of mandate issue restraining the Department of Alcoholic Beverage control from enforcing subdivisions- (f) (3) and (f) (4) of rule 100. The temporary stay issued by this court will be dissolved upon issuance of the peremptory writ.
 

 Janes, J., and Pierce, J.,
 
 *
 
 concurred.
 

 A petition for a rehearing was denied December 13, 1971, and respondents’ petition for a hearing by the Supreme Court was denied January 13, 19-72.
 

 [1]
 

 The text of rule 100 is lengthy. For the purpose of this opinion it is necessary to quote only the first four subsections of subdivision (f) of rule 100:
 

 “(f) (1) A quantity discount may be offered on a sale of two or more cases, whether original cases or assorted cases, and on each package in excess of two cases on a pro rata basis.
 

 “(2) All postings including quantity discount schedules are public record.
 

 “(3) Quantity discounts filed for any item of distilled spirits, in any quantity, must be mathematically certain so as not to permit the computation of two or more discounts for the same quantity of the same item of distilled spirits. (Item of distilled spirits is as defined in Rule 99(c).)
 

 “Distilled spirits included in minimum retail price schedules filed by the same licensee under the provisions of Section 24755 (c) may be posted to assort for quantity discounts, and when so posted each item shall take its respective discount at the rate of the total quantity purchased, except that imported distilled spirits, upon which duty is paid, may not be assorted with domestic distilled spirits. (Item of distilled spirits is as defined in Rule 99(c).)
 

 “(4) On any assortment discounts as authorized and limited by subparagraph (3) of this paragraph, the quantity discounts allowed thereby may not be conditioned upon the purchase of any specific item or items of distilled spirits in any quantity.”
 

 [2]
 

 All statutory references are to the Business and Professions Code, unless otherwise noted. In view of later portions of this opinion, we quote in full sections 24749, 24756 and 24757.
 

 Section 24749: “It is the declared policy of the State that it is necessary to regulate and control the manufacture, sale, and distribution of alcoholic beverages within this State for the purpose of fostering and promoting temperance in their consumption and respect for and obedience to the law. In order to eliminate price wars which unduly stimulate the sale and consumption of alcoholic beverages and disrupt the orderly sale and distribution thereof, it is hereby declared as the policy of this State that the sale of alcoholic beverages should be subjected to certain restrictions and regulations. The necessity for the enactment of provisions of this chapter is, therefore, declared as a matter of legislative determination.”
 

 Section 24756: “Every distilled spirits manufacturer, brandy manufacturer, rectifier, and wholesaler shall file and maintain with the department a price list showing the prices at which distilled spirits are sold to retailers by the licensee. Domestic brandy shall not be assorted with other distilled spirits for quantity discounts, except that imported brandy, upon which duty is paid, may be assorted for quantity discounts only with imported distilled spirits upon which duty is paid. Sales of distilled spirits to retailers by each distilled spirits manufacturer, brandy manufacturer, rectifier, and wholesaler shall be made in compliance with the price list of the licensee on file with the department.”
 

 Section 24757: “The department may adopt such rules as it determines to be necessary for the administration of Sections 24754 to 24756, inclusive, and shall take such steps as may be necessary to enforce the provisions of such sections and the rules adopted by it for the administration thereof.”
 

 [3]
 

 Section 25503 provides in part:
 

 “No manufacturer, wine grower, manufacturer’s agent, rectifier, distiller, bottler, importer, or wholesaler, or any officer, director, or agent of any such person, shall do any of the following:
 

 “(e) Wilfully or knowingly discriminate, in the same trading area, either directly or indirectly, in the price of any brand of distilled spirits sold to different retail licensees purchasing under like terms and conditions.”
 

 [4]
 

 Government Code section 11424 provides: “The notice of proposed adoption, amendment, or repeal of a regulation shall include:
 

 
 *191
 
 “(a) A statement of the time, place, and nature of proceedings for adoption, amendment, or repeal of the regulation;
 

 “(b) Reference to the authority under which the regulation is proposed and a reference to the particular code sections or other provisions of law which are being implemented, interpreted, or made specific;
 

 “(c) Either the express terms or an informative summary of the proposed action;
 

 “(d) Such other matters as are prescribed by statute applicable to the specific state agency or to any specific regulation or class of regulations.”
 

 [5]
 

 The Attorney General’s response to the alternative writ declares that the three complaining licensees are all petitioners in the present lawsuit. Petitioners do not gainsay that declaration. Since we shall sustain the emergency action, there is no need to consider questions of waiver or estoppel.
 

 [6]
 

 In its declaration of emergency the department stated:
 

 “The department has been advised by industry licensees at all levels that the rule as heretofore promulgated and filed on November 12, 1970, lacked clarity, and that said licensees found difficulty in applying its terms to specific situations.
 

 “The department finds that the rule as attached hereto expresses departmental intent with greater clarity than the rule as heretofore promulgated.
 

 “The matter of posting of prices is of prime importance to licensees at all levels in the industry, and it is essential that such licensees clearly understand what is intended thereby; therefore, this finding of emergency in the interest of public welfare and necessity.
 

 “The said regulation is therefore adopted as an emergency regulation to take effect on December 14, 1970, as provided in Section 11422(c) of the Government Code.”
 

 [7]
 

 Business and Professions Code section 23090.5 provides:
 

 “No court of this state, except the Supreme Court and the courts of appeal to the extent specified in this article, shall have jurisdiction to review, affirm, reverse, correct, or annul any order, rule, or decision of the department or to suspend, stay, or delay the operation or execution thereof, or to restrain, enjoin, or interfere with the department in the performance of its duties, but a writ of mandate shall lie from the Supreme Court or the courts of appeal in any proper case.”
 

 A companion provision is section 23090, which directs parties affected by orders of the Alcoholic Beverage Control Appeals Board (as distinguished from the department) to apply to the State Supreme Court or the courts of appeal for review.
 

 [8]
 

 In part article VI, section, 10, declares: “The Supreme Court, courts of appeal, superior courts, and their judges have original jurisdiction in habeas corpus pro
 
 *196
 
 ceedings. Those courts also have original jurisdiction in proceedings for extraordinary relief in the nature of mandamus, certiorari, and prohibition.
 

 “Superior courts have original jurisdiction in all causes except those given by statute to other trial courts.”
 

 [9]
 

 The evolution of the principle is narrated in Jaffe,
 
 Judicial Review: Question of Law
 
 (1955) 69 Harv.L.Rev. 239; Jaffe,
 
 Judicial Review: Question of Fact
 
 (1956) 69 Harv.L.Rev. 1020; Jaffe,
 
 Judicial Review: Constitutional and Jurisdictional Fact
 
 (1957) 70 Harv.L.Rev. 953.
 

 *
 

 Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.