302 A.2d 304.

THE EAST GREENWICH FIRE DISTRICT *vs.* PENN CENTRAL COMPANY *et al.*

TOWN OF EAST GREENWICH *vs.* PUBLIC UTILITIES COMMISSION.

MARCH 30, 1973.

PRESENT: Paolino, Powers, Joslin and Kelleher, JJ.

PAOLINO, J. On May 17, 1972, the East Greenwich Fire District and the town of East Greenwich each filed a petition for certiorari pursuant to the provisions of G. L. 1956 (1969 Reenactment) §39-5-1, as amended, by P. L. 1969, ch. 240, sec. 8, to review an order filed by the Public Utili-

ties Commission on May 10, 1972, relating to an application filed by the Penn Central Company on September 4, 1969. The writs issued on May 23, 1973, in accordance with the mandate in §39-5-2, and on the following day the petitioners filed a motion for a stay of the commission's order pending this court's action upon their petition for certiorari. We assigned this motion specially to the calendar of June 15, 1972, for oral argument. *See East Greenwich Fire District* v. *Penn Central Co.*, 110 R. I. 913, 291 A.2d 435 (1972), and *Town of East Greenwich* v. *Public Utilities Comm'n.*, 110 R. I. 913, 291 A.2d 436 (1972). On June 20, 1972, we granted the motion of each petitioner in part.[1]

The facts are not in dispute and are briefly as follows. On September 4, 1969, Penn Central Company (Penn Central) filed an application with the Public Utilities Commission requesting permission to close public crossings at Long Street and Queen Street in the town of East Greenwich and to install automatic flashing lights and gates at the London Street crossing in that town in lieu of the existing manual protection presently in existence at that crossing. All of the crossings in question are within the East Greenwich Fire District and at the time of the application they were all manned crossings. It is undisputed that the crossings involved in this action were all public crossings.

On September 25, 1969, the commission held a public hearing on this application in the council chambers at the town hall in East Greenwich. Penn Central presented three witnesses.

Mr. R. C. Heckel, a highway crossing engineer for Penn Central, testified that as a matter of experience, automatic protection is far superior to manual protection; that the

---

[1]Roberts, C.J. did not participate in any of these orders.

automatic warning devices are sufficient for young children and that the railroad department has an education department to instruct children in schools; and that if an order permitting the substitution of automatic devices was issued, the railroad would arrange to conduct an educational program for school children in the area. He admitted under cross-examination that Penn Central's application was based upon traffic studies dealing with civilian vehicles and pedestrian crossings and that there was no special attention to the requirements of the fire department apparatus.

With respect to London Street he testified:

> "At the present time we feel we can put in automatic protection at London Street and give the town far superior type of crossing protection than they now have."

And he further testified as follows:

> "But, we think in closing these two crossings, and protecting this one at London Street, we can give and know we can give the town far better protection than they have now."

Mr. Richard J. Duggan, train master of Penn Central in Providence, who is responsible for the movements of trains through East Greenwich, testified as to train movements through that town and the speed limits involved. He also stated that the speed of the trains in the area in question was governed by track curvature rather than by the fact that crossings were there.

Mr. Frank C. Fotta, Penn Central regional engineer for communication and signals, introduced preliminary plans proposed by Penn Central and explained the reasoning behind the proposal. He testified as to studies made indicating the relative safety of manual gates and automatic protection and he spoke about safety factors involving young children and elderly persons. He then testified as follows:

> "As our sight visit to the crossings disclosed, the grade at both Queen and Long Streets is very undesirable. That is, at Queen Street we have a serious drop-off on

the west side of the tracks. At Long Street we have a serious grade approaching the tracks from the east side. Both of those crossings are very narrow and on the nature that major or large vehicles would have difficulty in traversing them. This led us to the natural conclusion that London Street would be the most desirable crossing to automate."

Mr. Frederick T. Miller, chief of the East Greenwich Fire District, testified for the fire district. His testimony in substance dealt with the requirements of proper fire protection in connection with the crossings involved. He disagreed with Penn Central's claim that London Street was the most logical highway to leave open by use of automatic devices. He opposed any change from manually operated grade crossings, but he stated that if some change was approved Queen Street was the most important highway to leave open. He spoke as follows with regard to this problem:

"Long Street we do not use because it is too sharp a turn coming out of the station. Queen Street is the most important street, and they are going to block it up. They are not going to put electric gates there. That is the widest street in town.

"As far as London Street is concerned, that is adequate as far as the railroad. After you get over the railroad and go beyond Lion Street, the road is not suitable. Water Street is not suitable for fire protection. We use King Street for the simple reason we don't use Division Street on account of the crossings. If we go down King Street and the gates are down, and we go under the bridge, the manufacturer there might have a truck across the street and you can't get through there."

The transcript shows that Chief Miller repeated this same feeling in cross examination. The record also contains the statements of other interested persons and town officials and the signatures of many objectors.

In its "Report and Order," which is dated May 10, 1973, the commission reviewed the evidence in some detail and

discussed its authority to act in a case such as this, stating that "The determination is to be made in accordance with the convenience of public travel and the effect of better security of human life." It further said that it had considered all the testimony and evidence presented to it, and had inspected the crossings to determine the feasibility of erecting effective pedestrian and vehicle fencing barriers, and the maneuverability of fire fighting apparatus through the streets crossing the railroad to the area east of the tracks. The commission also investigated the suitability of automatic gates at each of the crossings and gave consideration to the areas used by the children to go to the Queen Street playground, and for the convenience of elderly citizens living east of the tracks.

The commission then made the following findings:

"The Commission finds that the proximity of the grade crossings to each other constitute a danger to East Greenwich citizens because of the high speed trains coming through that town. The Commission finds that better protection for the public would be afforded by the elimination of precarious, marginally useful mainline crossings. The Commission further finds, however, that public safety would be better served by rejecting the application of the Penn Central Company to close and barricade the streets within the limits of the tracks at Long Street and Queen Street and to install automatic flashing lights and gates in substitution of the existing manual protection at London Street, and instead to order the barricading of the streets within the limits of the tracks at London Street and Long Street and installing and maintaining at Queen Street automatic flashing lights and gates in substitution for the existing manual protection."

On the basis of such findings it entered the following order:

"1. Penn Central Company may permanently close and barricade the streets within the limits of the tracks at Long Street (Crossing 48.92) and London Street

(Crossing 48.84) provided chain link fencing or other suitable barricading is installed on both sides of the track at each of the foregoing streets for sufficient distances to avoid the tracks being crossed by young children. The Penn Central Company shall retain an attendant at said crossings during daylight hours until such barricades or fencing are approved by the Division of Public Utilities and Carriers.

"2. Penn Central Company shall install, maintain and operate at Queen Street (Crossing 48.98) automatic flashing lights and gates in substitution of the existing manual protection provided an attendant is kept on duty at said crossing during the hours of the day when children go to and from school or patronize the playground on Queen Street until such time as the Penn Central Company shall have completed a course of instruction with regard to crossing safety and until the Division of Public Utilities and Carriers approves the discontinuance of such attendant's services at said crossing."

The briefs of petitioners are substantially alike and raise essentially the same issues. For this reason we shall treat them as one where convenient.

## I

The petitioners' first assignment of error is that there was no request made by Penn Central to close London Street, that no evidence was ever submitted to warrant the closing of that street, and that in the absence of such evidence the matter should be remanded to the commission. In support of their argument petitioners refer to the testimony of the three witnesses presented by Penn Central and which we have discussed above. In addition petitioners cite the guidelines which this court set forth in *United Transit Co.* v. *Nunes*, 99 R. I. 501, 504, 209 A.2d 215, 217 (1965), where we said:

"In reviewing an order of the administrator we confine ourselves to a consideration of its lawfulness and reasonableness and his findings of fact will not be dis-

turbed if they are fairly and substantially supported by legal evidence. (cites omitted) If, however, we are unable to ascertain with reasonable certainty the true basis of his decision and the factual premises upon which his findings of fact rest, we will neither speculate thereon nor search the record for evidence in support thereof, nor will we decide for ourselves what is proper in the circumstances."

The fallacy of petitioners' argument claiming that there is no evidence to support the commission's action with respect to London Street is that they overlook the testimony of Chief Miller upon which the commission relied. As we have stated above, the commission expressly rejected Penn Central's position that Queen and Long Streets could be closed without danger to the public safety in favor of Chief Miller's opinion that Queen Street was the most important street to remain open. This testimony supports the commission's finding that the public safety would be better served by rejecting Penn Central's application to close and barricade the public crossings at Long and Queen Streets and to install automatic flashing lights and gates in place of the manual protection at London Street. Chief Miller's testimony also substantiates the commission's order to barricade London and Long Streets and install and maintain at Queen Street automatic flashing lights and gates in substitution for the existing manual protection. On this record we cannot say that the commission's order is unreasonable and since its findings are supported by competent evidence they will not be disturbed by this court. *United Transit Co.* v. *Nunes, supra.* The fact that no request was made by Penn Central to close London Street has no legal significance.

## II

The petitioners' next argument is that §39-8-1.1, dealing with the control of grade crossings by the commission, is purely prospective. This section, which was enacted by

P. L. 1969, chap. 240, sec. 10 and approved May 16, 1969, reads as follows:

> "In the exercise of the police power of the state for the safety of its inhabitants, the general assembly vests in the commission the authority and power to determine the point at which and the manner in which any grade crossing of a railroad and a street shall be constructed and the jurisdiction to determine whether any such crossing should be altered, relocated, abolished or eliminated, and the manner and conditions under which such crossings shall be maintained, even if the order of the commission has the effect of depriving a municipality of control of its streets."

The petitioners argue in substance that this section of the statute gives the commission power from the date of approval of the statute to determine the points and manners of grade crossings to be constructed in the future, and the power to alter, eliminate, relocate or abolish any of those crossings so constructed. They argue further that since the crossings involved in this case had been in existence prior to the date the act was approved on May 16, 1969, it did not apply to such crossings.

We do not agree with petitioners' understanding of the meaning of the language of §39-8-1.1. We believe they have overlooked the significance of the language of §39-8-1.2 which defines "public crossings" as follows:

> "As used in this title, (a) public crossings shall mean and refer to those crossings of railroad tracks at grade which have been laid out or built with the consent of the division of public utilities expressed in writing as provided in §39-8-3, or which have been designated as public crossings by order of a court of competent jurisdiction * * *."

Counsel for the parties conceded during oral arguments before us that the crossings involved here are public crossings. The Legislature's use of the past tense in §39-8-1.2(a), where it speaks of crossings which "have been laid out or

built,", or which "have been designated as public [grade] crossings," indicates that in enacting §39-8-1.1, the Legislature intended to cover public crossings already in existence as well as crossings to be constructed in the future. It is clear that the evident purpose for enacting §39-8-1.1 was to provide for the public safety by giving the commission broad powers relating to the construction of any grade crossing of a railroad and a street, and the altering, relocating, abolishing or eliminating of such crossings, and the manner and conditions under which they shall be maintained, "* * * even if the order of the commission has the effect of depriving a municipality of control of its streets." We are satisfied that the legislative intent was to provide for both existing crossings and crossings to be constructed after the enactment of this section.

But even if we were to conclude that the language of this section is ambiguous, we will not impose a construction on it which will defeat its evident purpose. *Deignan* v. *Cowan Plastic Products Corp.*, 99 R. I. 193, 206 A.2d 534 (1965); *Condon* v. *First National Stores, Inc.*, 65 R. I. 129, 13 A.2d 684 (1940). Nor will we attribute an unreasonable intent to the Legislature. *Zannelli* v. *Di Sandro*, 84 R. I. 76, 121 A.2d 652 (1956). To hold that in enacting §39-8-1.1, the Legislature was providing only for crossings to be built after the enactment of the statute would, in our judgment, be unrealistic, would attribute to the Legislature an unreasonable intent, and would result in defeating the evident purpose of the statute. We refuse to so construe §39-8-1.1.

In view of the broad grant of power vested in the commission by §39-8-1.1, we find no merit to petitioners' argument that the only authority in the commission to close grade crossings is conferred by §39-8-1.4 which relates only to private crossings. The petitioners' remaining arguments relative to the authority of the commission to abolish and eliminate the public crossings involved in these cases are

so lacking in merit as to require no further discussion. The petitioners have quoted certain language from *Taber* v. *New York, Prov. & Boston R.R.,* 28 R. I. 269, 273, 67 A. 9, 11 (1907), on which they place great importance. That case dealt with the location of a railroad on Allens Avenue in Providence. We agree with the quoted language but fail to see how it helps petitioners' position in the case at bar in view of the provisions of §39-8-1.1.

### III

We next consider the Fire District's argument that this cause should be remanded to the commission for reconsideration of new evidence pursuant to the provisions of §39-5-5, as amended. The Fire District argued that since Penn Central at a hearing before this court on June 15, 1972, stated that there is a proposed agreement about to be executed between the state and national departments of transportation and Penn Central affecting the area involved in this cause, and which agreement was not discussed at the September 25, 1969 hearing before the commission, this matter should be remanded to the commission.

Section 39-5-5 reads, in pertinent part, as follows:

> "If after appeal has been taken to the supreme court, new evidence shall be discovered by any party, an affidavit setting forth the newly-discovered evidence shall be filed in the supreme court, and if that court finds the same to be of such character and sufficient importance to warrant reconsideration of the matter by the commission, the clerk of the supreme court shall transmit a copy of the affidavit to the commission for further consideration, and the court shall stay further proceedings in the supreme court for such time as it shall deem proper."

This request is not properly before us. We agree with Penn Central's statement that the failure of petitioners to follow the procedure prescribed in §39-5-5 bars them from entitlement to the relief requested here. Since no other

means exists for obtaining reconsideration by the commission after appeal, the procedure prescribed by §39-5-5 is exclusive and must be substantially complied with.

## IV

The petitioners' final argument challenges the sufficiency of the notice of the September 25, 1969 hearing. They contend that a serious doubt exists as to whether the notice of the hearing caused to be published by the commission comports with the due process clause of the fourteenth amendment· to the Constitution of the United States. They rely on the following statement in *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), where the Court said:

> "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314, 70 S.Ct. at 657, 94 L.Ed. at 873.

They argue that the notice published set forth that there would be a hearing on possible barricading of Queen and Long Streets and the installation of automatic devices at London Street; that the notice did not mention that the closing of London Street was a possibility; that a person relying on this notice would conclude that London Street would remain open and, therefore, had been prejudiced since London Street had been ordered closed. In the circumstances they ask that the matter be referred back to the commission directing adequate notice and further hearings.

Before discussing the merits of petitioners' instant contention it may be apposite to point out that in *Chariho Regional High School District* v. *Town Treasurer*, 109 R. I. 30, 280 A.2d 312 (1971), we held that the town of Hopkin-

ton, being a creature of the Legislature, was without standing to raise the issue that the statute authorizing the towns of Charlestown, Richmond and Hopkinton to join in a regional high school district constituted a denial of the equal protection clause of the fourteenth amendment to the Constitution of the United States. This suggests the question whether in the case at bar the town of East Greenwich, also a creature of the Legislature with no inherent right to self-government, has standing to raise the issue of insufficiency of notice by the commission which is an agency of the state. Although we raise this question, we do not believe we are required to answer it because the East Greenwich Fire District also challenges the sufficiency of the notice in question and therefore the question of the sufficiency of the notice of the September 25, 1969 hearing is properly before us.

We note at the outset that, on this record, petitioners have failed to show that they were prejudiced by the notice given in this case. They were present at the hearing, participated therein and had an opportunity to present their objections.

We further note that the parties have referred to no statutory provision, or rule or regulation of the division of public utilities, pertaining to notice.

The question remains, however, whether the notice given by the commission meets the due process test prescribed in *Mullane, supra.* We believe that it does. The notice was " * * * reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Thus, the notice was reasonably calculated to inform interested persons that Penn Central was applying for some action and relief relating to the crossing in question. It is impossible, as a practical matter, to establish a rule which can be applied in every case. Each case

must be decided on its own facts. This was pointed out in *Schroeder* v. *City of New York,* 371 U. S. 208, 212, 83 S. Ct. 279, 282, 9 L.Ed.2d 255, 259 (1962), where the Court said in effect that practical considerations make it impossible to draw a standard set of specifications as to what is constitutionally adequate notice, to be mechanically applied in every situation. The fact that the relief granted differed from the relief requested does not prove that the notice was inadequate. It must be remembered that under §39-8-1.1 the basic consideration confronting the commission was the public welfare. As we have stated above, we believe that the notice given was reasonably calculated to put interested parties on notice that Penn Central was seeking relief with respect to the crossings in question. This did not mean that the commission could only grant or deny the application as made. As the court pointed out in *Schenley Affiliated Brands Corp.* v. *Kirby,* 21 Cal. App.3d 177, 193, 98 Cal. Rptr. 609, 622 (1971), in a case involving a proposed rule:

> "Although section 11424, subdivision (c), requires a pre-hearing notice of the text or summary of the proposed action; although it does not echo the federal statute's alternative permission for a notice describing the subject or issue, nevertheless, it is not offended if the adoption procedure culminates in a regulation differing substantially from that described in the published notice but devoted to the same subject or issue."

Likewise, in the case at bar, although the order entered deviated in some respects from the relief requested, it pertains to the same streets.

The petitions for certiorari are denied and dismissed, the writs heretofore issued are quashed, and the records certified to this court are ordered returned to the Public Utilities Commission.

Mr. Chief Justice Roberts did not participate.

Mr. Justice Powers participated in the decision but re-

tired prior to its announcement. Mr. Justice Doris did not participate.

Mr. Justice Kelleher concurring. My concurrence is directed to the issue of notice. In *DeLucia* v. *Town of Jamestown,* 107 R. I. 179, 265 A.2d 636 (1970), we ruled that where notice has been given of a public hearing on a proposed amendment to a zoning ordinance and the ordinance as finally adopted differs substantially from the proposal described in the notice, the insufficiency of the notice could be raised by an individual who was present at the hearing and aware of the counterproposals which caused the city or town council to take the action that it did. I would not extend the rule of *DeLucia* to all of the proceedings governed by the Administrative Procedures Act. An examination of the record compiled during the East Greenwich hearing gives compelling evidence as to why some flexibility as to notice is desirable.

The notice which was given by the Public Utilities Commission satisfied the mandate of *Mello* v. *Board of Review,* 94 R. I. 43, 177 A.2d 533 (1962), because it revealed the "precise character of the relief sought" and "the specific properties for which such relief is sought." The commission's notice informed the public that it would hold a hearing on the railroad's desire to barricade the grade crossings at Long and Queen Streets and install automatic gates at the London Street crossing.

When the hearing began, the president of the East Greenwich Town Council informed the commission of the council's opposition to the closing of Long and Queen Streets. The commission was in receipt of a letter from the town planning board giving a qualified approval to the railroad's proposal. An attorney representing residents in the area voiced opposition to the closing of any of the crossings and expressed concern for the financial future of the crossing guards whose jobs were to be eliminated. He presented

the commission with petitions containing about 100 signatures. Several of the signatories resided on London Street. The chief of the fire district then took over and he stressed the value of Queen Street to the firefighters. "Queen Street," he said, "should not be blocked off," because a "major hydrant" is found on that thoroughfare and the street's width permits easier maneuvering of the district's fire trucks. Counsel for the fire district also informed the commission that he represented a waterfront restaurant located on Queen Street. The restaurant opposed the closing of Queen Street because it would be adverse to its business and a threat to the safety of its clientele. A communication from the East Greenwich Democratic Town Committee, signed by its secretary,[1] was made part of the record. It expressed the committee's opposition to Penn Central's proposal.

After the fire chief had made his views known, a representative of the railroad informed the commission that it made no difference to Penn Central which two of the three crossings were closed and which one would remain open. I have no doubt that when the hearing concluded, the representatives of the town and the fire district were well aware that the chief's forceful presentation would play an important role in the commission's ultimate determination.

The commission was faced with a difficult choice. It had been informed that the automatic gates gave greater protection than those that are manually operated. Trains pass through the town of East Greenwich at a speed of 75 miles per hour. Once the chief had spoken, the commission became cognizant of its duty to balance the risks of collision against the risks of conflagration. In the light of the evidence presented to it, the commission exercised the wisdom of Solomon.

---

[1]Apparently counsel for the fire district wore several hats to the hearing. He is also the committee's secretary.

The 1969 legislation (39-8-1.4) which authorized the abandonment of grade crossings, contains no provisions for a hearing. It is my ·belief that our holding in *DeLucia* is premised upon the express provisions of G. L. 1956 (1970 Reenactment) §45-24-4 .which requires any adoption, repeal, or amendment of a zoning ordinance to be preceded by a public hearing with notice thereof being given by the placing of a notice in a newspaper having general circulation within the municipality at least once a week for three successive weeks prior to the ·hearing date. We have said that the giving of such notice is prerequisite to a council's exercise of its legislatve power. *Rhode Island Home Builders, Inc.* v. *Budlong Rose Co.*, 77 R. I. 147, 74 A.2d 237 (1950).

The significance of §42-35-9(4) of the Administrative Procedures Act cannot go unnoticed. It allows an agency or a person, who is unable at the time of the giving of the notice to state in detail the matters to be considered at ·the hearing, to limit its initial notice to a statement of the issues involved at the hearing. This provision shows a legislative intent not to impose upon the numerous and various state agencies that come within the umbrella of the act the rigidity which limits a city or town council in its consideration of a zoning ordinance or amendment. Notice of a hearing is not required to contain an accurate forecast of the precise action which will be taken upon the subject matter referred to in the notice. *Neuger* v. *Zoning Board*, 145 Conn. 625, 145 A.2d 738 (1958); *Heaton* v. *City of Charlotte*, 277 N.C. 506, 178 S.E.2d 352 (1971). The appellants had no right to assume that the commission which is entrusted with the plenary power of eliminating grade crossings was bound to accept in toto Penn Central's application. *See Hewitt* v. *County Commissioners of Baltimore County*, 220 Md. 48, 151 A.2d 144 (1959).

Inferentially the absence of an appeal by the residents of

the area is evidence that they were not surprised by the commission's ultimate decision.

Consequently, I believe that since the commission had jurisdiction of the subject matter of the hearing, neither the town nor the fire district can be heard at this late date on their claim relative to the insufficiency of the notice. Both were active participants at the hearing and were well aware of what was going on. They can be placed in the same category as the individual who goes to a zoning board, complains about a lack of notice but stays on and offers his views as to what or what should not be done. Such conduct, we have said, constitutes a waiver of the notice requirement. *Champagne* v. *Zoning Board,* 99 R. I. 283, 207 A.2d 50 (1965); *Perrier* v. *Board of Appeals,* 86 R. I. 138, 134 A.2d 141 (1957).

For the reasons cited herein, I have no doubt that the board acted within its jurisdiction.

Mr. Justice Joslin dissenting in part. Notice of the hearing in this matter was required by the Administrative Procedures Act, G. L. 1956 (1969 Reenactment) §42-35-9.[1, 2]

_____

[1]That provision reads as follows:
  "42-35-9. Contested cases — Notice — Hearing — Records. — (a) In any contested case, all parties shall be afforded an opportunity for hearing after reasonable notice.
  (b) The notice shall include:
  (1) a statement of the time, place, and nature of the hearing;
  * * *
  (4) a short and plain statement of the matters inserted. If the agency or other party is unable to state the matters in detail at the time the notice is served, the initial notice may be limited to a statement of the issues involved and detailed statement shall be furnished."

[2]While it is true, as my brother Kelleher says, that there is no specific provision for a hearing in the 1969 legislation (P.L. 1969, ch. 240, sec. 10) authorizing the abandonment of grade crossings, I am sure he is not thereby suggesting that the Legislature intended that the hearing and notice provisions of the Administrative Procedures Act would not apply

The notice, as given, stated that the issue involved was the application of the Penn Central Company (Penn Central) for permission to close and barricade public crossings at Long and Queen Streets and to replace the existing manual protection at the London Street crossing with flashing lights and gates.

While I do not question the commission's authority to determine that a grade crossing of a railroad and a street shall be barricaded and closed, I do question its jurisdiction to make such a determination with respect to the London Street crossing on a notice which in no way alluded to that possibility. The variance between matters which the notice stated would be considered at the hearing and the relief subsequently authorized following the hearing was in my judgment so substantial as to indicate that the notice did not contemplate the action ultimately taken. The action was, therefore, beyond the commission's jurisdiction. *DeLucia* v. *Town of Jamestown*, 107 R. I. 179, 186-87, 265 A.2d 636, 639-40 (1970); *In re Village Board*, 77 N.D. 194, 212-14, 42 N.W.2d 321, 332-33 (1950).

The plurality view the problem in a different light. They say, that the notice as given was "reasonably calculated to inform interested persons that Penn Central was applying for *some action* and relief relating to the crossing in question." (emphasis added) But the question in this case is not whether the commission gave notice of "some action" relating to London Street. That it certainly did. Rather, the question is whether notice that "some action" would be taken relating to the crossings satisfied the statutory provision mandating a "plain statement" of the matters to be considered. *Supra,* n. 1.

---

in a proceeding like this where the commission is asked to determine the rights, duties and privileges of parties. For a general discussion of the requirement for a hearing see 1 Davis, *Administrative Law Treatise* ch. 7 at 407-512 (1958).

Whether the notice satisfies that mandate is a "pure question of law" which, in the final analysis, depends upon whether an interested party reading it could reasonably have anticipated that the outcome of the hearing would entail the closing and barricading of London Street rather than the substitution at that crossing of one type of safety equipment for another. *DeLucia* v. *Town of Jamestown, supra* at 186, 265 A.2d at 639. The answer, it seems to me, must be in the negative.

A comparable situation, albeit involving notice in a zoning proceeding rather than in one involving a railroad crossing, is found in *Mello* v. *Board of Review*, 94 R. I. 43, 177 A.2d 533 (1962). There, although the applicant sought permission to convert a building located on two contiguous lots, the notice given to the public stated that the building proposed for conversion was located on only one of those lots. In those circumstances we held that the enabling legislation's requirement to "give public notice" was jurisdictional; that whatever jurisdiction was acquired could not in any event exceed the precise character of the relief sought and the specific property for which that relief was sought; and that the variance between what had been applied for and what was specified in the notice as the subject matter of the application was so substantial that the zoning board did not acquire jurisdiction to act on the application.

In this case — where the discrepancy between the relief applied for and that granted is certainly no less than in *Mello* — the same principle must also apply, and the commission in order to remain within the limitations imposed by the notice should have taken no action which was not reasonably compatible with what the notice stated was the nature and character of the relief sought by the application.

The plurality refer to and quote from *Schenley Affiliated*

*Brands Corp.* v. *Kirby,* 21 Cal. App.3d 177, 98 Cal. Rptr. 609 (1971). That case, however, is clearly inapposite. It construes a statute regulating the type of notice required to be given by an agency prior to the adoption, amendment or repeal of any rules or regulations. Here, we construe a provision (§42-35-9, *supra,* n. 1) prescribing the notice to be given in a contested case involving a determination of the legal rights, duties or privileges of parties having conflicting interests.

The two statutory provisions are entirely different, as are the purposes which each is designed to serve. Their differing terms and dissimilar contexts hardly make the construction which one has received precedential for that which the other should receive.

Finally, the plurality say that in any event the petitioners have not shown that they were prejudiced, and that the absence of such a showing is defeating. That position misconceives the nature of the jurisdictional problem presented in this case. It is not that the service of the notice was improper or that the notice itself suffered from a technical defect. In either of those situations a general appearance might constitute a waiver thereby precluding the litigant from claiming prejudice. The problem here, however, is not with the form of the notice, or with its service, but with its sufficiency at the outset to confer jurisdiction on the commission to hear and determine Penn Central's application. That, in the first instance, depended upon strict compliance with the statutory notice provisions. *Mello* v. *Board of Review, supra* at 49, 177 A.2d at 535-36. There was therefore, nothing to be waived. *DeLucia* v. *Town of Jamestown, supra* at 186, 265 A.2d at 639.

What I say here is also responsive to my brother Kelleher's view that the commission's jurisdiction to act, even if limited by the notice, was somehow enlarged by what was said at the hearing by the chief of the fire district and

by the fire district's attorney. The plain fact is, however, that the commission's jurisdiction to act in this particular proceeding, irrespective of the power conferred on it by statute to hear and determine all manner of questions relating to railroad grade crossings, could in no event extend beyond the scope of the notice given, and nothing that was said at the hearing could empower it to act on any matter not properly noticed.

In sum, I conclude that the commission was limited by the notice to a consideration of questions relating to the kinds of safety equipment to be installed at the London Street crossing, and was not free to go beyond that public notice and authorize the closing and barricading of London Street. *Rhode Island Home Builders, Inc.* v. *Budlong Rose Co.*, 77 R. I. 147, 152, 74 A.2d 237, 239 (1950); *Elof Hansson, Inc.* v. *United States*, 178 F. Supp. 922, 930 (Cust. Ct. 1959).

I would grant the petition for certiorari in part and quash so much of the decision as authorizes the barricading and closing of London Street.

Motion to reargue denied.

Mr. Chief Justice Roberts did not participate.

Mr. Justice Powers participated in the decision but retired prior to its announcement.

Mr. Justice Doris did not participate.

*George A. Bristol,* for East Greenwich Fire District, East Greenwich.

*Peter D. Nolan,* Town Solicitor of East Greenwich, *Leo J. Dailey,* for Town of East Greenwich, for petitioners.

*Roberts & Willey* Incorporated, *Dennis J. Roberts, II,* for Penn Central Company, for respondent.