## Richmond

### AMERICAN BANKERS LIFE ASSURANCE COMPANY OF FLORIDA; GENERAL FIDELITY LIFE INSURANCE COMPANY; VIRGINIA BANKERS ASSOCIATION; FIRST VIRGINIA LIFE INSURANCE COMPANY; AMERICAN DEFENDER LIFE INSURANCE COMPANY; UNION SECURITY LIFE INSURANCE COMPANY; FIRST PROTECTION LIFE INSURANCE COMPANY; INTEGON LIFE INSURANCE CORPORATION; DURHAM LIFE INSURANCE COMPANY

### v.

### DIVISION OF CONSUMER COUNSEL, OFFICE OF ATTORNEY GENERAL, STATE CORPORATION COMMISSION AND CLARENCE TOWNSEND

February 29, 1980.

Records Nos. 791180, 791189, 791193, 791198, 791200, 791201, 791202, 791203, 791204.

Present: I'Anson, C.J., Carrico, Harrison, Cochran, Poff and Compton, JJ.

774

*Robert P. Buford (Lathan M. Ewers, Jr.; Hunton & Williams,* on brief), for appellant. [Record No. 791180].

*Howard W. Dobbins (William A. Young, Jr.; Wallerstein, Goode & Dobbins,* on brief), for appellant. [Record No. 791189].

*John W. Edmonds, III (Stephen A. Northup; Mays, Valentine, Davenport & Moore,* on brief), for appellant. [Record No. 791193].

*Edward L. Breeden, III (Breeden, Howard & MacMillan,* on brief), for appellant. [Record No. 791198].

*Robert E. Payne (O. Randolph Rollins; Laurence M. Hamric; McGuire, Woods & Battle,* on brief), for appellants. [Records Nos. 791200, 791201, 791202, 791203, 791204].

*Scott W. Williams; Joan W. Murphy, Assistant Attorney General; Peter B. Smith (Marshall Coleman, Attorney General; Richard D. Rogers, Jr.* on briefs), for appellees. [Records Nos. 791180, 791189, 791193, 791198, 791200, 791201, 791202, 791203, 791204].

I'ANSON, C.J., delivered the opinion of the Court.

In this appeal brought pursuant to Code § 12.1-39, we consider various challenges to the substance of the State Corporation Commission's "Rules Governing Credit Life Insurance" (hereafter referred to as the Rule) and the procedure used by the Commission in promulgating the Rule. The primary issues for resolution are whether provisions of the Rule exceed the Commission's statutory authority provided in Code §§ 38.1-482.1 through -482.16, and whether the Commission denied procedural due process in promulgating a rule different from its initial proposal without additional notice and opportunity to comment.

Credit life insurance is "insurance on the life of a debtor pursuant to or in connection with a specific loan or other credit transaction." Code § 38.1-482.2(a). Although insurers occasionally sell such insurance directly to debtors, it is generally sold by the creditor (frequently a lending institution) under a group policy. Thus, although the insurer provides the coverage, the creditor generally performs the various administrative services related to the insurance. Specifically,

the creditor generally collects the premium or finances it with the loan and remits a portion of the premium to the insurer while retaining the balance to cover its costs and commission. The portion remitted to the insurer is used to pay losses, to cover costs, and to provide a return on the investment. If the debtor dies while the debt is outstanding, the insurance proceeds are paid to the creditor to discharge the debt.

## I.

In the past three decades, during which consumer sales and use of credit have grown rapidly, state authorities have increasingly recognized the need for regulation of credit life insurance. Note, 1973 Wis. L. Rev. 943, 945. In 1960, the Virginia General Assembly adopted Article 5.1 of Chapter 9 of Title 38.1 (Code §§ 38.1-482.1 through -482.16), which regulates credit life insurance and credit accident and sickness insurance. In 1972, Article 5.1 was amended to require the Commission's disapproval of any form for credit life insurance if the Commission "finds that the premium rates or charges are not reasonable in relation to the benefits provided." Code § 38.1-482.7(b). The General Assembly, however, did not adopt a proposed amendment that would have required the Commission to issue "regulations setting forth the prima facie rates which may be charged for credit life and accident and sickness insurance."

The Rule promulgated by the Commission establishes an interim rate and provides for subsequent experienced-based rates for each insurer. The experienced-based rate allows an insurer to charge rates that produce or can reasonably be expected to produce a loss ratio (the ratio of payments for mortality losses to premiums earned) of 50%. The interim rate, providing for a yearly premium of 60 cents for every $100 of indebtedness insured, was also based upon a loss ratio of 50% and was calculated on the basis of a study of mortality losses incurred by Virginia credit life insurers. Section 11 of the Rule provides, however, that "if the insurer can demonstrate to the Commission that such rates are inadequate to produce a fair return to the creditor and insurer," the insurer may receive a rate higher than the interim or experience-based rate.

The appellants contend that the Commission's Rule constitutes a veiled attempt to set rates, a power that the appellants claim is not granted to the Commission by either Code § 38.1-482.7[1] or Code

---

[1] § 38.1-482.7. **Forms of policies, etc., to be filed with Commission; approval or disapproval by Commission.** — (a) All forms of policies, certificates of insurance,

§ 38.1-482.13(a).[2] In particular, the appellants rely upon the Commission's order dated July 31, 1974 (Case No. 15019), in which the Commission expressly disavowed any rate-setting powers, and upon the General Assembly's refusal to adopt the proposed amendment requiring the Commission to promulgate regulations setting forth prima facie rates. In addition, the appellants claim that Section 11 of the Rule is contrary to Code § 38.1-482.7 in that if the insurers' proposed rate exceeds the interim or experienced-based rate, the insurers bear the burden of proving the reasonableness of a rate request.

■ We do not agree with the appellants' contention that the General Assembly's refusal to adopt the proposed amendment is a clear indication of the legislature's desire to prohibit the Commission from issuing a prima facie rate. It is noteworthy that the section that would

statements of insurance, endorsements and riders intended for use in this State shall be filed with the Commission.

(b) The Commission shall within thirty days after the filing of any such policies, certificates of insurance, statements of insurance, endorsements and riders, disapprove any such form if it contains provisions which are contrary to, or not in accordance with, any provision of this article or of any rule or regulation promulgated thereunder, or if it finds that the premium rates or charges are not reasonable in relation to the benefits provided. In making such determination due regard shall be given to a fair return to creditor and insurer and in any case the benefits provided by any such policy form shall be deemed reasonable in relation to the premium charged or to be charged if the ratio of losses incurred to premiums earned is not less than fifty percent or may reasonably be expected to be not less than fifty percent.

(c) If the Commission notifies the insurer that the form is disapproved, it is unlawful thereafter for such insurer to issue or use such form. In such notice, the Commission shall specify the reason for its disapproval and state that a hearing will be granted within twenty days after request in writing by the insurer. No such policy, certificate of insurance, statement of insurance, endorsement or rider, shall be issued or used until the expiration of thirty days after it has been so filed, unless the Commission shall give its prior written approval thereto.

(d) The Commission may, at any time after a hearing held not less than twenty days after written notice to the insurer, withdraw its approval of any such form on any ground set forth in subsection (b) above. The written notice of such hearing shall state the reason for the proposed withdrawal.

(e) No insurer shall issue such forms or use them after the effective date of such withdrawal.

[2] § 38.1-482.13. **Rules and regulations of Commission; order for compliance with article.** — (a) The Commission may, after notice and hearing, issue such rules and regulations consistent with the provisions of this article as it deems appropriate for the supervision of the regulatory provision of this article. Every such regulation, every administrative ruling, and every requirement of general application shall be in writing and maintained as a public record in an indexed permanent book with date of each suitably indicated. A copy of each regulation and order promulgating it shall be mailed by the Commission to all insurers licensed to write insurance under this article.

have been amended, Code § 38.1-482.13, allows the Commission to "issue such rules and regulations consistent with the provisions of this article as it deems appropriate for the supervision of the regulatory provision of this article." The proposed amendment would have added a sentence *requiring* the Commission to set a prima facie rate. While it is possible that the General Assembly's rejection of the amendment reflected a desire to prohibit such a prima facie rate making, it is equally likely that the legislature merely wished to avoid *requiring* the Commission to undertake such a task or concluded that the power conferred by the amendment was unnecessary in light of the broad rule-making power already conferred in Code § 38.1-482.13(a). In the absence of a clearer indication of legislative intent, we cannot accord significant weight to the General Assembly's refusal to amend Code § 38.1-482.13.

■ Moreover, because we conclude the Rule does not constitute rate setting, we find that the Rule is consistent with the Commission's prior ruling in Case No. 15019. The cases cited by the appellants for the proposition that other states' regulatory entities have not been given the authority to regulate rates, *see, e.g., State ex rel. Commissioner of Insurance* v. *Integon Life Insurance Co.*, 28 N.C. App. 7, 220 S.E.2d 409 (1975), and *Calhoun Life Insurance Co.* v. *Gambrell,* 245 S.C. 406, 140 S.E.2d 774 (1965), are not persuasive here because the statutes discussed in those cases do not parallel Article 5.1, which specifically requires the Commission to disapprove forms setting forth unreasonable rates. Far more helpful is *Old Republic Life Insurance Co.* v. *Wikler,* 9 N.Y.2d 524, 175 N.E.2d 147, 215 N.Y.S.2d 481 (1961), a case cited by the appellees, because the New York statute discussed in *Wikler* resembles Virginia's in several important respects. Under the New York statute, the Superintendent of Insurance was required to disapprove premium rates if they were "unreasonable in relation to the benefits provided." *Id.* at 528, 175 N.E.2d at 148, 215 N.Y.S.2d at 483. The Superintendent was also allowed to issue written regulations in furtherance of his supervisory duties. Pursuant to his regulatory authority, the New York Superintendent issued a regulation setting forth a prima facie rate that he would consider adequate and "not unreasonable" as a standard for insurers. *Id.* at 529, 175 N.E.2d at 148, 215 N.Y.S.2d at 483. Under a section similar to Section 11 of the Commission's Rule, insurers could charge higher rates if they could demonstrate that such rates were justified. The New York Court of Appeals, rejecting insurers' claims that such a system constituted rate setting, concluded that the Superintendent had merely exercised his authority to issue a regula-

tion in furtherance of his supervisory duties. The court noted that "[w]hether or not [his authority to disapprove forms providing for unreasonable rates] permits him to make or fix rates, it is well within his statutory powers to suggest reasonable ones . . . as a sort of guide or 'bench mark' for insurers, while affording them freedom to show that higher rates would not be unreasonable." *Id.* at 530, 175 N.E.2d at 149, 215 N.Y.S.2d at 484. "In point of fact, a standard announced in advance is often in aid of sound administration and the fair exercise of public power. In the case before us, it will afford an insurer a short-cut method of securing approval for premium rates." *Id.* at 531, 175 N.E.2d at 150, 215 N.Y.S.2d at 485. We believe that this reasoning is equally applicable to the Rule and consequently hold that the Rule's sections setting forth a bench mark for determining reasonableness are not an improper exercise of the Commission's authority.

■ Furthermore, we conclude that the Commission had the statutory authority to establish the 50% loss ratio as the bench mark to be used in determining the reasonableness of proposed rates. Under Code § 38.1-482.7(b), the Commission "in any case" is obliged to deem a rate reasonable "if the ratio of losses incurred to premiums earned is not less than fifty percent or may reasonably be expected to be not less than fifty percent." The appellants contend that this language was intended to set forth the 50% figure as a statutory minimum and that the Commission has promulgated a rule under which the 50% loss ratio functions as a ceiling upon an insurer's rates. While this language clearly sets forth a floor for the Commission's determination of reasonableness, nothing in this section indicates that the Commission cannot also use the 50% figure as a bench mark. Furthermore, contrary to the appellants' contentions, the Rule does not mandate the 50% loss ratio as a ceiling upon insurers' rates. If insurers believe a loss ratio lower than 50% is necessary to provide a fair return to insurer and creditor, they can petition the Commission for a rate reflecting a lower loss ratio.

■ Section 11 of the Rule requires insurers to bear the burden of justifying a rate exceeding that allowed by the experienced-based or interim rates. We reject the appellants' contention that this requirement deviates from Code § 38.1-482.7(b), which provides that the Commission shall disapprove forms "if it finds that the premium rates or charges are not reasonable in relation to the benefits provided." In interpreting statutory language allowing for the disapproval of rates if they were "excessive, inadequate or unfairly discriminatory," the Supreme Judicial Court of Massachusetts held that insurers bear the burden of producing evidence sufficiently establishing the reason-

ableness of their proposed rates and that the failure to provide such evidence is a proper basis for disapproval of the rates. *Travelers Indemnity Co.* v. *Commissioner of Insurance,* 362 Mass. 301, 305, 285 N.E.2d 442, 445 (1972). *Accord, Insurance Services Office* v. *Whaland,* 117 N.H. 712, 719, 378 A.2d 743, 747 (1977); *Wikler, supra,* 9 N.Y.2d at 531-32, 175 N.E.2d at 150, 215 N.Y.S.2d at 485-86; *State ex rel. Commissioner of Insurance* v. *North Carolina Fire Insurance Rating Bureau,* 292 N.C. 471, 482-83, 234 S.E.2d 720, 726 (1977). Under ordinary principles of administrative law, the insurer must establish that its filing meets statutory standards. *Wikler, supra,* 9 N.Y.2d at 531, 175 N.E.2d at 150, 215 N.Y.S.2d at 485-86. Section 11 is merely a restatement of the insurer's obligation to demonstrate that it is entitled to have its filing approved.

## II.

■ The appellants also contend that the Commission's interim rate is not supported by sufficient evidence. In determining the interim rate, the Commission relied heavily upon one particular study conducted by the Bureau of Insurance. The study consisted of an analysis of mortality losses incurred during a three-year period (1974, 1975, and 1976) by 99 of the 313 insurance companies offering credit life insurance in Virginia. It reported that the average annual loss incurred by these companies was $.2610 per $100 of insurance. During the period covered by the study, insurers were subject to the Commission's interim rate of 78 cents for every $100 of indebtedness. An undetermined amount of insurance of a higher rate was also included. In determining the loss ratios for each company, the Bureau of Insurance merged data on different forms issued by each company. Assuming that a 50% loss ratio would provide a fair return to insurer and creditor, the Bureau multiplied the $.2610 figure by two, thus deriving an interim rate of approximately 52 cents per $100 of insurance. In order to provide some leeway, the Commission added eight cents to this rate, resulting in the interim rate of 60 cents per $100 of insurance. While the appellants introduced evidence indicating that a higher interim rate was justified, we feel that the mortality study provided a sufficient evidentiary basis for the Commission's rate-making decision. *See Roanoke Gas Co.* v. *Division of Consumer Counsel,* 219 Va. 1072, 1080, 254 S.E.2d 102, 106 (1979). Although there were imperfections in the mortality study, we do not believe these imperfections are so serious that the study should not have been used as the basis for establishing the interim rate. Further-

more, the Commission's decision to raise by eight cents the rate suggested by its staff compensates for some of these imperfections.

■ Noting that Code § 38.1-482.7(b) requires the Commission to give "due regard . . . to a fair return to creditor and insurer" in determining the reasonableness of rates, the appellants argue that the Commission erred because its staff presented no study of costs incurred by, or a fair return for, Virginia insurers and creditors. Nothing in Code § 38.1-482.7(b), however, requires the Commission to have available a study of these factors. Moreover, nothing in Code § 38.1-482.7(b) requires the Commission to consider evidence concerning these factors at this particular stage of the rate review process. The Rule gives "due regard" to these factors in two ways. First, it allows a loss ratio of 50%, a figure deemed quite suitable for providing a fair rate of return by several states and by the Consumer Credit Insurance Association (an organization representing 130 insurance companies). Several witnesses testified that a loss ratio as high as 70% would be appropriate. Second, the Rule guarantees insurers the opportunity to present (and requires the Commission to consider) evidence concerning creditor and insurer costs and a fair return to insurer and creditor when insurers seek a rate higher than the interim or experienced-based rates. Only insurers and creditors are privy to such information, and requiring insurers to come forward with this information when they seek a higher rate does not diminish the "due regard" given to these factors.

## III.

■ The appellants raise several other objections to the content of the Rule. Several of these objections require no elaborate treatment. First, since the five-day limitation on delivery of a copy of the policy, as set forth in Section 4C of the Rule, mirrors the requirements of Code § 38.1-482.6(e),[3] we reject the contention that the time period specified in Section 4C is arbitrary or had to have an evidentiary basis. Second, appellants' contention that the Rule requires a standardization of benefits is undermined by the unequivocal language of Section 9B of the Rule, which provides an alternative procedure for reviewing the rates of policies providing benefits different from those set forth in Section 10B. Third, since the Rule, unlike the proposed rule,

---

[3] Code § 38.1-482.6(e) provides: "Where any part of the premium is paid by the debtors, or by the creditor from identifiable charges collected from the insured debtors not required of uninsured debtors, then a copy of the individual policy or certificate or statement of insurance shall be delivered to the insured debtor at the time the insurance is effected or within five days thereafter."

deleted the inclusion of a factor for investment income, the challenge to the inclusion of such a factor need not be addressed. Fourth, Section 15, which provides that an insurer delegating legal duties to a creditor "shall be responsible to see that such creditor discharges such duties in accordance with said laws and regulations," does not, as several appellants contend, prohibit an insurer's delegation of duties, contrary to Code § 38.1-482.9(b).[4] Furthermore, since Section 15 imposes responsibility upon the insurer for any legal duties delegated and an insurer can readily ascertain its legal duties, a full recitation of these duties in Section 15 is unnecessary. Fifth, we also reject the argument that Section 19's distinction between the Rule's effective dates for new and replacement policies is arbitrary. Because Section 19 provides that existing credit life insurance must conform to the Rule no later than the policy's anniversary date following the Rule's effective date, insurers might seek to circumvent the Rule by issuing replacement policies having a later anniversary date. Section 19's distinction between replacement policies and new policies thus furthers a legitimate Commission goal.

 Several appellants contend that Section 8, which provides that maximum benefit limit provisions in policies apply "only to that specific indebtedness for which such certificate or statement was issued," conflicts with Code § 38.1-482.3(c)(4).[5] Section 8 allows a debtor to acquire more than $10,000 of insurance by allowing the debtor to purchase two or more policies that are for $10,000 or less individually but that aggregate to more than $10,000. The appellants claim that Code § 38.1-482.3(c)(4) was intended as a limit on an insurer's maximum loss resulting from the death of a single debtor, not merely a limit on the loss incurred under a single policy. The definitions provided in Code § 38.1-482.2 undermine their argument. Credit life insurance is defined as "insurance on the life of a debtor pursuant to or in connection with *a* specific loan or other credit transaction." Code § 38.1-482.2(a) (emphasis added). Indebtedness is defined as "the total amount payable by a debtor to a creditor in connection with *a* loan or other credit transaction." Code § 38.1-482.2(e) (emphasis added). These definitions indicate that Code § 38.1-

---

[4] Code § 38.1-482.9(b) provides: "All of the acts necessary to provide and service credit life insurance and credit accident and sickness insurance may be performed within the same place of business in which is transacted the business giving rise to the loan or other credit transaction."

[5] Code § 38.1-482.3(c)(4) provides in pertinent part: "The amount of insurance on the life of any debtor shall at no time exceed the amount owed by him which is repayable in installments to the creditor, or ten thousand dollars, whichever is less."

482.3(c)(4) was intended to provide a limit upon the loss incurred under a single policy. Consequently, we conclude that Section 8 of the Rule does not conflict with Code § 38.1-482.3(c)(4).

■ We agree, however, with the appellants' contention that the Commission lacks the statutory authority to promulgate Section 16, which regulates reserves maintained by credit life insurance companies. Code § 38.1-482.1 clearly stipulates that "no other provisions of [Title 38.1] shall be applicable unless otherwise specifically provided." Since nothing in Article 5.1 specifically grants the Commission the authority to regulate reserves, we conclude that the Commission lacks this authority.

■ The appellants raise two other problems meriting rectification. First, they argue that Section 11's description of fair return does not clearly allow the insurer a fair return after the payment of all costs, including creditors' commissions. Section 11 specifies that fair return includes "all sums paid to the creditor by the insurer and all sums earned by the creditor with respect to the creditor's sale and servicing of credit insurance." Although acknowledging this language is "an inartful expression" of its intention, the Commission claims this language solely concerns the question of a creditor's fair return and pledges to abide by such a restricted application of this language in Section 11. Second, Form A, to be used by insurers in submitting their experience data concerning credit life insurance, does not clearly specify that insurers should submit only information concerning credit life insurance sold in Virginia. The Commission responds that Section 2, which specifies that the Rule is applicable to credit life insurance sold in Virginia, resolves any ambiguity. The form itself, however, provides that the report "includes all credit life insurance for [the] reporting company." We conclude that the Commission must remedy these ambiguities in Section 11 and Form A.

## IV.

■ Having considered the appellants' objections to the substance of the Rule, we now examine their objections to the procedure employed by the Commission in promulgating the Rule.[6] The appellants

---

[6] We find it unnecessary to discuss at length the appellants' contention that the Commission has failed to file an adequate statement of the reasons for its decision. We conclude that the Commission's opinion meets the requirements of Code § 12.1-39, as interpreted in *Appalachian Pow. Co.* v. *Commonwealth,* 216 Va. 617, 625, 221 S.E.2d 872, 877-78 (1976), which holds that the Commission opinion must be sufficiently specific and documented that it allows us to ascertain the basis of the Commission's action.

argue that the Commission failed to provide procedural due process because it promulgated a rule differing substantially from its proposed rule without providing additional notice and opportunity for public comment. In addition to citing the general constitutional provisions for due process found in the Fourteenth Amendment of the Constitution of the United States and Article I, Section 11 of the Constitution of Virginia, the appellants rely upon Virginia's constitutional requirement that "[b]efore promulgating any general order, rule, or regulation, the Commission shall give reasonable notice of its contents." Constitution of Virginia, Article IX, Section 3. See also Code § 12.1-28 and Rule 4:12 of the Commission's Rules of Practice and Procedure, which in addition require the Commission to "afford interested persons having objections thereto an opportunity to present evidence and be heard." The appellants contend that if the Commission wishes to promulgate a rule that differs substantially from a proposed rule, it is required to undertake an additional round of notice and comment.

In support of their claim, the appellants rely heavily upon *Appalachian Power Co.* v. *Commonwealth,* 132 Va. 1, 110 S.E. 360 (1922), for the broad proposition that the Commission may not change a proposed rule without providing an additional notice of the changes it wishes to make. *In Appalachian Power Co.,* which concerned an appeal from a Commission order specifically against the Appalachian Power Company, the Commission adopted a rate tariff that paralleled one recommended by the Commission's engineer without providing the parties any opportunity to consider or object to the report before its recommended tariff was adopted. We held that the Commission's action "deprived the power company of due process of law." *Id.* at 9, 110 S.E. at 363.

An analysis of the constitutional and code provisions then in effect[7]

---

[7] Section 156(b) of the 1902 Constitution of Virginia provided in pertinent part: "Before the commission shall prescribe or fix any rate, charge, or classification of traffic, and before it shall make any order, rule, regulation or requirement directed against any one or more companies by name, the company or companies to be affected by such rate, charge, classification, order, rule, regulation or requirement . . . shall be afforded a reasonable opportunity to introduce evidence and to be heard thereon, to the end that justice may be done, and shall have process to enforce the attendance of witnesses; and before the commission shall make or prescribe any general order, rule, regulation or requirement, not directed against any specific company or companies by name, the contemplated general order, rule, regulation or requirement shall first be published in substance, not less than once a week for four consecutive weeks in one or more of the newspapers of general circulation published in the city of Richmond, Virginia, together with notice of the time and place, when and where the commission will hear any

indicates that our decision in *Appalachian Power Co.* rested upon the Commission's clear violation of provisions prohibiting the Commission from considering evidence in its adjudicative capacity[8] without providing the affected party the opportunity to be heard on such evidence. Nothing in *Appalachian Power Co.* suggests, however, that a rule or order actually promulgated by the Commission cannot differ from the proposed rule or order if the party affected has had an opportunity to be heard on the evidence considered by the Commission. Indeed, the *Appalachian Power Co.* case seems to be of little utility to the case under consideration since in this case the Commission acted in its legislative, rather than its adjudicative, capacity and in this case, unlike in *Appalachian Power Co.*, the Commission considered no evidence without providing the affected parties the opportunity to be heard on the evidence.

 While we have not previously resolved whether the Commission may promulgate a rule differing from its proposed rule without triggering an additional round of notice and comment, we believe that *Ciaffone* v. *Community Shopping Corp.*, 195 Va. 41, 49-50, 77 S.E.2d 817, 822 (1953), provides guidance on this issue. In *Ciaffone*, we rejected the argument that the appellants had not been given sufficient notice because of a discrepancy between a proposed zoning plan included with the public notice and the zoning plan actually adopted. Code § 15-859, subsequently repealed, provided that "no such regulation, restriction or boundary shall become effective until

objections which may be urged by any person interested, against the proposed order, rule, regulation or requirement; and every such general order, rule, regulation or requirement, made by the commission shall be published at length, for the time and in the manner above specified, before it shall go into effect, and shall also, as long as it remains in force, be published in each subsequent annual report of the commission."
Code § 3711 (1919) paralleled this text.

[8] Section 156 of the 1902 Constitution of Virginia, like Article IX, Section 3 of the present Constitution of Virginia, distinguished between due process requirements when the Commission acts in an adjudicative capacity (where the Commission enters an order or judgment against a party by name) and due process requirements when the Commission acts in a legislative capacity (where the Commission enters a general order or regulation not directed against any specific party by name). Adjudicative due process requirements are inapplicable where the Commission is not entering an order against a party. *See Second Nat'l.* v. *New Bank of Culpeper*, 215 Va. 132, 133-34, 210 S.E.2d 136, 137 (1974) (discussing identical language found in Code § 12.1-28). The due process requirements for adjudicative hearings are quite different from the due process requirements for administrative rule making. *Winchester, &c., R. Co.* v. *Commonwealth*, 106 Va. 264, 281, 55 S.E. 692, 698 (1906) (concurring opinion). *See also Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U.S. 519, 542 (1978).

after a public hearing in relation thereto, at which parties in interest and citizens shall have an opportunity to be heard." We construed this section as not requiring that the notice "contain an accurate forecast of the precise action which the County Board will take upon the subjects mentioned in the notice of hearing." 195 Va. at 50, 77 S.E.2d at 822. We concluded instead that this Code section "means only that parties in interest and citizens must be apprised of the proposed changes to be acted upon so they can be present to state their views." *Id.* at 50, 77 S.E.2d at 822.

While *Ciaffone* discusses notice and comment provisions concerning zoning ordinances, we conclude that it provides a clear understanding of the purpose of such provisions: "to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Schroeder* v. *City of New York,* 371 U.S. 208, 211 (1962). Such notice and comment provisions clearly contemplate that an agency may wish to alter its proposal after receiving public comment. Since possible change in the regulation is the very reason for the public comment, a party is not denied due process merely because the proposed regulation was not "an accurate forecast of the precise action which [the agency] will take upon the subjects mentioned in the notice of hearing." *Ciaffone,* 195 Va. at 50, 77 S.E.2d at 822.

Requiring an agency to provide an additional notice and comment period when it decides to change any provisions in a proposed rule would change the purpose of these notice provisions. Knowing that changes would trigger an additional round of notice and comment, agencies might be reluctant to change an original proposal even though the arguments for change offered at a hearing are persuasive. *Bassett* v. *State Fish and Wildlife Commission,* 27 Or. App. 639, 642, 556 P.2d 1382, 1384 (1976). Parties desiring to delay regulation would be inclined to point to potential weaknesses in a proposed plan without offering alternatives, knowing that an agency would be required to undertake an additional round of notice and comment before making any change. Such a process might lead to an endless round of notices and hearings before a regulation could be implemented.

Nevertheless, the changes in a promulgated rule may occasionally be so significant that their adoption without an additional period for notice and comment would deny interested parties their rights guaranteed by Article IX, Section 3 of the Constitution of Virginia. The Commission is not required, however, to provide additional notice and opportunity for comment where the changes in the promulgated rule,

even if substantial, do not enlarge the proposed rule's subject matter,[9] *Schenley Affiliated Brands Corp.* v. *Kirby,* 21 Cal. App. 3d 177, 193, 98 Cal. Rptr. 609, 622 (1971); *Bassett* v. *State Fish and Wildlife Commission,* 27 Or. App. 639, 642, 556 P.2d 1382, 1384 (1976); *East Greenwich Fire District* v. *Penn Central Co.,* 111 R.I. 303, 315-16, 302 A.2d 304, 310-11 (1973), and are a logical outgrowth of the public comments received. *South Terminal Corp.* v. *Environmental Protection Agency,* 504 F.2d 646, 658-59 (1st Cir. 1974).

We turn now to an application of this test to the facts of this case. In announcing the proposed rule, the Commission ordered the issuance of a notice specifying the time and location of a public hearing "for the purpose of adopting and issuing a regulation governing credit life insurance" and mentioning that the proposed regulation was on file at the Commission office and could be examined by any party in interest. Once a week for three weeks, this notice appeared in eight newspapers published in different Virginia cities. The Commission also ordered that copies of the notice and the proposed regulation be mailed to every company licensed to transact credit life insurance in the state.

Under the proposed rule, the reasonableness of premium rates would have been determined by a creditor-based case-rating system. Under this system, the Commission would have measured the reasonableness of premiums against the loss-ratio experience under policies issued to particular classes of businesses: credit unions, commercial savings banks, "other cash loans" (including small loans and industrial bank loans), and "other sales finance" (including discount transactions). Approval of a rate for each policy form would have depended upon the loss ratio experienced within different classes of creditor accounts through which that policy form was sold.

At the hearing, several representatives of the insurance industry suggested that the creditor-based case-rating system was too costly and too cumbersome. Prior to the hearing, the Commission had notified the interveners that they could file post-hearing memoranda "addressing the case-rating method proposed by the Staff and any other matters which have arisen during the course of the hearings." In a jointly filed brief, several interveners objected to the case-rating system as beyond the scope of the Commission's statutory authority and suggested an alternate system as "more workable." Under the interveners' proposal, the Commission would establish a prima facie rate and would allow

---

[9] For example, the Commission could not, without providing additional notice, promulgate a rule concerning credit insurance for accident and sickness if the notice and proposed rule solely concerned credit life insurance.

deviations from this rate where an insurer's proposed rates are "necessary to produce a fair return to the creditor and insurer" or where the proposed rates "produce or can reasonably be expected to produce a loss ratio of not less than 50% on all business written within the Commonwealth."

Under the Rule promulgated after the period for notice and public comment, the Commission substituted an insurer-based system for the creditor-based case-rating system initially proposed. Under the Rule, the insurer-based system allowed each insurer, "[o]n the basis of experience as required to be reported under Section 14," to charge a premium rate "which produces a loss ratio of at least fifty percent or can reasonably be expected to produce a loss ratio of at least fifty percent." The experience report required by Section 14 of the Rule, unlike the report required under the proposed rule, asks for data concerning an insurer's overall experience and does not request data on losses incurred in business with particular classes of creditors.

In its opinion detailing the reasons for the Rule, the Commission acknowledged that "a considerable part of the record . . . and [its] deliberations have centered around such a system." Echoing the sentiments expressed in the interveners' brief, the Commission described the creditor-based case-rating system as "unnecessarily cumbersome" and concluded that it "should be modified and simplified." Basing an insurer's rate on its overall experience with all creditors, the Commission concluded, "represents a more accurate and meaningful manner" for judging rates because it provides for a broader experience base than the case-rating system.

The appellants argue that the Commission denied procedural due process to the general public by promulgating a rating methodology substantially different from the case-rating methodology contained in the proposed Rule. Furthermore, they contend that the Commission denied them procedural due process by promulgating a methodology that significantly differed from the one contained in the interveners' brief.

We acknowledge that the methodologies proposed by the interveners and promulgated by the Commission are not identical. The interveners' proposal contemplates a uniform prima facie rate with deviations allowed in order to provide a fair return and to achieve a loss ratio (based upon a company's overall experience) approximating 50%; the Commission's system contemplates rates that are determined on a company-by-company basis and that approximate a 50% loss ratio for each company (as determined by the company's overall experience), with a deviation allowed in order to provide a fair return.

Unlike the Rule, the interveners' proposal contemplates uniform rates with allowable deviations. The Commission's system has taken a component allowing for deviations and converted it into the norm for determining a company's rates. The difference between the two systems is that, under the interveners' proposal, an insurer must come forward to seek a rate based upon its loss experience. This difference would not be significant if, under the interveners' proposal, insurers falling within the exception acted upon their right to claim a higher rate.

Although the Rule deviates from the interveners' proposal, we conclude that the procedure used by the Commission meets the requirements for due process set forth in the Constitution of Virginia, Code § 12.1-28, and Commission Rule 4:12. The Rule does not enlarge the proposed rule's subject matter. Furthermore, the methodology adopted in the Rule is a logical outgrowth of the public comments received. "It should be clear to commenters when they criticize a regulatory scheme that if the agency accepts those criticisms, a new scheme will be substituted. The commenters cannot claim they had no notice to propose and discuss alternatives." *BASF Wyandotte Corp.* v. *Costle,* 598 F.2d 637, 643 (1st Cir. 1979), *cert. denied sub nom., Eli Lilly & Co.* v. *Costle,* 48 U.S.L.W. 3533 (February 19, 1980). "They should have realized that these criticisms, if accepted, could be resolved [in other ways] . . . [T]hough [the agency's] solution was not the one for which the industry argued, it was suggested by and, in part, a logical outgrowth of industry's comments." *Id.* The appellants cannot complain that they have not been provided with notice and an opportunity to comment merely because the Commission accepted their criticism of the initial methodology but chose a solution somewhat different from the one they proposed.

As to Section 16 of the Rule, the order of the Commission is reversed. The case is remanded to the Commission for modification of Section 11 and Form A in accordance with this opinion. Except for the above-noted provisions, the Commission's order is affirmed.

*Affirmed in part,*
*reversed in part,*
*and remanded.*